Clyde ADAMS, (87–1096), Plaintiff–Appellant,

v.

Mary Ann VANDEMARK, Executive Director, and Human Development Commission, a Michigan Not–For–Profit Corporation, Defendants–Appellees;

Mark S. PANKNIN, (86–2034), Plaintiff–Appellant,

v.

Mary Ann VANDEMARK, Human Development Commission, Jointly and Severally, Defendants–Appellees.

Nos. 87–1096, 86–2034.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 26, 1988.

Decided Aug. 24, 1988.

Forrest Walpole (argued), Caro, Mich., Francis C. McIntyre (argued), Mill Valley, Cal., for plaintiff-appellant.

H. Dale Cubitt (argued), Bad Axe, Mich., for defendants-appellees.

Before ENGEL, Chief Judge *; MERRITT, and KENNEDY, Circuit Judges.

KENNEDY, Circuit Judge.

Plaintiff-appellant Clyde Adams ("Adams") appeals from the judgment of the District Court granting the motion of defendants-appellees Mary Ann Vandemark and the Human Development Corporation ("HDC") for summary judgment in his civil rights action. Plaintiff-appellant Mark Panknin ("Panknin") appeals from the judgment of the District Court granting the motion of defendants-appellees for a directed verdict in his civil rights action. These cases present the question of whether the defendants acted under color of state law when they discharged the plaintiffs.

Defendant HDC, a Michigan non-profit corporation, conducts business in Caro, Michigan. Defendant Vandemark is the executive director of HDC. HDC employed Adams as a specifications writer from April 25, 1980 until December 7, 1981, when Vandemark fired him. He sued pursuant to 42 U.S.C. § 1983 [1], alleging that he had been discharged in retaliation for exercising his first amendment rights. After a jury trial Adams was awarded $40,000 damages against Vandemark, and $85,000 against HDC. Another panel of this Court reversed the judgments and remanded for a new trial [2], holding that the District Court had incorrectly instructed the jury as to the element of "color of law." On remand, the District Court granted the de-

---

* The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

1. 42 U.S.C. § 1983 provides in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

2. The Sixth Circuit initially affirmed, but reversed and remanded on reconsideration. Joint Appendix at 13–31.

fendants summary judgment on the issue of whether they had acted under color of state law.

HDC employed Panknin as a crew coordinator for a federally-funded weatherization program from March, 1980 through September, 1982, when Vandemark fired him. He, too, brought an action pursuant to section 1983, alleging that Vandemark fired him in retaliation for his exercise of his first amendment rights. At the close of Panknin's case the District Court granted the defendants' motion for a directed verdict. Panknin J.A. at 63.

"The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982) (citation omitted).[3] Phrased another way, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982).

The Supreme Court has used several theories, or tests, to determine whether an action was taken under color of state law or amounted to state action. The test most relevant to this case is the "symbiotic relationship" test[4], which the Supreme Court established in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In *Burton* a restaurant that was located in a municipally-owned parking garage refused to serve a

black man. The man sued, alleging that the restaurant's actions violated the fourteenth amendment. The Court found that the parking garage, and therefore the city, profited from the discrimination, and that the profits were "indispensable elements in ... the financial success of a government agency." *Id.* at 724, 81 S.Ct. at 861. Consequently, the Court held, "[t]he State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity," and thus the restaurant's discrimination was state action. *Id.* at 725, 81 S.Ct. at 862.

*Rendell–Baker v. Kohn,* a more recent case discussing the symbiotic relationship test, presented the issue of whether a private school, whose income is derived primarily from public sources and which is regulated by public authorities, acted under color of state law when it discharged certain employees. The school was a non-profit institution for maladjusted teenagers. The students were referred to the school by city schools or by the state department of mental health. Public funds accounted for between 90% and 99% of the school's budget. The cities regulated the school; however, aside from general requirements such as equal employment opportunity, the regulations did not cover personnel policies.[5] The plaintiffs had been employed at the school, and alleged that they had been discharged in retaliation for their exercise of first amendment rights.

The Court held that the school's receipt of public funds did not make the discharge decisions acts of the state: "Acts of such private contractors do not become acts of the government by reason of their signifi-

---

**3.** The Supreme Court stressed in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 928, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482 (1982) that the "color of law" requirement of § 1983 matches the "state action" requirement of the fourteenth amendment.

**4.** The plaintiffs do not appear to argue that either of two other tests, the "public function" test, *Flagg Bros. v. Brooks,* 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978) or the "state compulsion" test, *Adickes v. S.H. Kress &*

*Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), applies to this case.

**5.** One plaintiff was a vocational counselor hired under a grant from the federal Law Enforcement Assistance Administration, whose funds were distributed in the state by the state Commission on Criminal Justice. As a condition of the grant, the Commission had to approve of the school's initial hire for the position. 457 U.S. at 833, 102 S.Ct. at 2767.

cant or even total engagement in performing public contracts." *Id.*, 457 U.S. at 841, 102 S.Ct. at 2771. Furthermore, the Court held that the extensive regulation of the school did not establish a basis for finding state action since the decisions to discharge the plaintiffs were not compelled or even influenced by any state regulation. *Id.* Although the Committee on Criminal Justice had the power to approve those hired as vocational counselors, the position of one of the plaintiffs, the Court held that the power was insufficient to make the discharge state action. *Id.* at 841–42, 102 S.Ct. at 2771–72.[6]

In *Crowder v. Conlan*, 740 F.2d 447 (6th Cir.1984) this Court applied *Rendell–Baker* and *Blum* in the context of whether a private hospital's board acted under color of state law when it restricted a physician's staff privileges. Although the hospital received considerable government funding, was subject to extensive state regulation, had two public officials on its board, and leased its facility from the county, we held that "the connections between the State and the [hospital] are insufficiently linked to the challenged actions of the defendants to warrant a finding of state action in the hospital's decision to restrict Dr. Crowder's staff privileges. Therefore, Dr. Crowder has not stated a claim for relief under 42 U.S.C. § 1983." *Id.* at 453.

Each plaintiff enumerates facts that he alleges demonstrate that HDC has a symbiotic relationship with the state of Michigan. It is undisputed that HDC was established as a non-profit Michigan corporation in order to participate in the receipt of grants to local community action programs initiated by the Director of the Office of Economic Opportunity in accordance with the Federal Economic Opportunity Act of 1964, Pub.L. No. 88–452, § 204. HDC was incorporated as a Michigan not-for-profit corporation in 1965 under the name of the Thumb Area

Economic Opportunity Commission. The organization adopted its present name in 1973. By virtue of the Michigan Economic & Social Opportunity Act of 1981, Mich. Comp.Laws Ann. § 400.1101 *et seq.*, HDC became a Community Action Agency. Mich.Comp.Laws Ann. § 400.1108; Panknin J.A. at 66–67. MCLA § 400.1109 describes the function of a community action agency as "serving as a primary advocate for the reduction of the causes, conditions, and effects of poverty and [providing] social and economic opportunities that foster self-sufficiency for low-income persons." As such an agency, HDC administers federal, state, and local funds for various social programs that are established by state law. Adams J.A. at 259–62. Federal, state, and local funds constitute between 90% and 99% of HDC's budget. Panknin J.A. at 77.

Plaintiff Panknin was associated with HDC's weatherization program. The program's purpose is to repair the homes of lower-income people in Caro so that the homes may better withstand the winter weather. The program is handled by the United States Department of Energy, and the funds were funneled to HDC through the Michigan Department of Labor, Bureau of Community Services. The program is closely regulated by both state and federal law. HDC also worked with Caro to administer a block grant from the federal government to improve housing in Caro. Plaintiff Adams' job as a specifications writer was to evaluate the buildings for which applications for funds had been made and to write specifications so that contractors could bid on the job.

State law requires that one-third of HDC's board of directors be composed of public officials. Mich.Comp.Laws Ann. § 400.1111. HDC conducts its business in a building owned by Caro, which leased

---

**6.** The Court rejected the plaintiffs' claim that the school performed a public function and that therefore its actions were actions of the state, stating that

our holdings have made clear that the relevant question is not simply whether a private group is serving a "public function." We have held that the question is whether the function

performed has been "traditionally the *exclusive* prerogative of the State." ... That a private entity performs a function which serves the public does not make its acts state action.

457 U.S. at 842, 102 S.Ct. at 2772 (citations omitted).

space to HDC for thirty years at the rent of one dollar per year. Adams J.A. at 41.

The plaintiffs allege four links between HDC and the state: public funding, government regulation, public facilities, and public officials on HDC's board. These links, the plaintiffs assert, demonstrate a symbiotic relationship between HDC and the state. All of these links have been addressed by previous cases.

Public Funding and Regulation

■ Like the school in *Rendell–Baker*, HDC is funded almost entirely by public sources, and is subject to regulation. Under the reasoning of *Rendell–Baker*, though, neither of these factors, without more, is sufficient to make a private entity's decision to discharge an employee attributable to the state, 457 U.S. at 840–42, 102 S.Ct. at 2770–72. There is no basis for finding that state regulation "compelled or even influenced" defendant Vandemark's decision to discharge the plaintiffs. Furthermore, "[t]hat programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State was responsible for decisions made by the entity in the course of its business." *Blum*, 457 U.S. at 1011, 102 S.Ct. at 2789.

Public Facilities

HDC has leased office space from Caro for a term of thirty years at the rent of one dollar per year. Furthermore, HDC received money from a Community Development Block Grant to renovate the office building, which also houses the administrative program offices of Caro. The plaintiffs assert that the lease and funding of renovation demonstrate an intertwining of Caro's and HDC's operations.

In *Crowder*, this Court discussed the effect of a city's leasing of space to a private corporation on the element of color of law. In that case the plaintiff, a doctor, alleged that a hospital and its staff violated his civil rights by restricting his staff privileges at the hospital. In support of his claim that the hospital took this action under color of state law he pointed out that in addition to receiving a significant amount of money from government sources and being subject to extensive state regulation, the hospital leased space in a building the county bought, pursuant to a financial arrangement authorized by statute. After concluding that public funding and state regulation were not enough to establish that the hospital had acted under color of state law, we stated with respect to the lease that:

> [A]lthough Christian County is the owner and lessor of the hospital's physical plant and assisted in the financing of some of the hospital's construction cost, the fact remains that the County is not involved in the day-to-day operation of the hospital. More importantly, [the plaintiff] has not demonstrated a nexus between the challenged action, the hospital's restriction of his staff privileges, and the limited governmental involvement alleged to provide the basis for a finding of state action, i.e. the County's leasing of the hospital facility to the hospital's Board of Trustees.

*Id.* at 453. The Court affirmed the dismissal of the plaintiff's section 1983 action.

■ Under this analysis, the mere fact that HDC leases, at a nominal rent, office space from Caro, is insufficient to establish that HDC acted under color of state law when it discharged him. Similarly, Caro's funding of the building's renovation is not in itself a basis for finding a link between the state and the plaintiffs' discharge. Rather, the plaintiffs must show that the lease or the funding affected the challenged acts, their discharges. They have not shown any such relationship.

We distinguish *Burton*. The Supreme Court's finding of state action in *Burton* was based in part upon the fact that the city leased the restaurant the space for its business, and construction, repairs, and maintenance of the property were made from public funds. 365 U.S. at 713–14, 81 S.Ct. at 898. The Court found that by virtue of the lease the "profits earned by discrimination not only contribute to, but are indispensable elements in, the financial success of a governmental agency," *Id.* at

724, 81 S.Ct. at 861. Neither of the plaintiffs in the case at bar has alleged that Caro has benefited from their discharges through the leasing of office space to HDC.[7]

Public Officials as Members of the Board

■ Perhaps the strongest indication of a symbiotic relationship between HDC and Caro is that state law requires one-third of HDC's board of directors to be public officials. Mich.Comp.Laws Ann. § 400.1111. The board adopted the personnel policy pursuant to which defendant Vandemark discharged the plaintiffs. Panknin J.A. at 190–99.

In *Crowder* two public officials, the mayor and the county judge/executive, served on the hospital's thirteen-member Board of Trustees by virtue of their offices. The Board of Trustees adopted a committee's recommendation to limit the plaintiff's staff privileges. In evaluating this factor the Sixth Circuit said that "[t]he fact that [two public officials] serve as ex officio members of the hospital's Board of Trustees ... although an important factor in establishing state action, is insufficiently linked to the challenged actions of the defendants in this case, and therefore, does not warrant a finding of state action." *Id.* at 451 (citation omitted). In support of its holding the court noted that the board adopted the recommendation to restrict the plaintiff's privileges only after four reviewing committees had determined that such an action should be taken. Thus, reasoned the court, the action was not the board's own independent decision, but instead the acceptance of the medical judgments of staff physicians.[8] *Id.*

In *Anderson v. National R.R. Passenger Corp. (Amtrak)*, 754 F.2d 202 (7th Cir. 1984) the court addressed the issue of whether government membership on Amtrak's board established government action for the purposes of the fifth amendment. Six members of the nine-member board represented the federal government, and those six controlled the appointment of a seventh member. Nonetheless, the court found that, absent any allegation that the government was involved with Amtrak's personnel policies or decisions, the composition of the board did not warrant a finding of government action. *Id.* at 204.

In the case before this Court, the HDC's board's only link to the challenged actions, the discharges, is the board's adoption of the personnel policies pursuant to which defendant Vandemark discharged Adams. Unlike the board in *Crowder*, there is no evidence that the board approved of the discharge. Given the holding of *Crowder* that public representation on the board, even when taken with public funding, government regulation, and facilities leased from a public entity, did not establish the requisite relationship necessary to find color of state law, we find that the facts of this case likewise do not support such a finding. Consequently, we hold that the plaintiffs failed to state a claim under section 1983 and that the District Court properly dismissed the suits.

Accordingly, we AFFIRM the judgment of the District Court.

MERRITT, Circuit Judge, dissenting.

I dissent because I believe that the majority has ignored a fundamental distinction necessary in state-action cases and therefore arrived at the wrong conclusion.

I.

The idea of "state action" embodied in the phrase "under color of any statute, ordinance, regulation, custom, or usage, of any State" in § 1983, and in the words "No State shall" of the Fourteenth Amendment, is the central legal concept behind an extensive legal "revolution" in American law of the past 25 years. Interpretation of this idea—its expansion and contraction in the

---

7. The more recent Supreme Court cases in this area appear to have limited the broad realm of state action *Burton* suggested.

8. The court went on to say that they recognized that the Sixth Circuit had found state action in

previous cases with similar circumstances, but that the legal reasoning of those cases was no longer valid in light of the recent Supreme Court cases in the area. *Crowder*, 740 F.2d at 452.

hands of judges and legislators—controls the extent of stability and change in major segments of American constitutional law by controlling what institutions and what officials and individuals may be subject to substantive constitutional duties in their relations with the citizenry.

The reinterpretation of "state action" in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), to include the abuse and misuse of state and local authority created new fields of constitutional tort, contract, restitution and procedural law. For an incisive survey and criticism of the new field of constitutional torts, see Christina Whitman's two articles, *Constitutional Torts*, 79 Mich.L.Rev. 5 (1981); *Government Responsibility for Constitutional Torts*, 85 Mich.L.Rev. 225 (1986). For contract, *see, e.g., Town of Newton v. Rumery*, 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed. 2d 405 (1987) (§ 1983 action in which validity and enforcement of contract waiving civil right to sue as part of settlement of civil case was upheld by 5 to 4 vote). For restitution, *see, e.g., Hogue v. Clinton*, 791 F.2d 1318 (8th Cir.) (Lay, C.J., dissenting in part) (discussing interplay between constitutional right deprived and restitutionary remedy) *cert. denied*, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986), and Justice Harlan's concurring opinion in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 400–11, 91 S.Ct. 1999, 2006–12, 29 L.Ed.2d 619 (1971) (explaining that the full complement of common law legal and equitable remedies are available to redress constitutional wrongs). For procedural innovation, *see, e.g., Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (creating pretermination right-of-reply hearing for employees discharged by state actors); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (devising test to balance individual and state interests at stake in a given procedure).

This new constitutional law, still evolving and in a state of early development, holds thousands of state and local institutions and their officials and employees to higher standards of conduct and confers new legal rights on the individuals and corporations who deal with them. This reinterpretation of "state action," and the new constitutional rights arising from it, have together gradually provoked change in the legal environment perhaps no less profound than the consequences of the new power to regulate interstate commerce created in the 18th and 19th Centuries. The gradual expansion of the "state action" concept and its purpose—to control and correct abusive conduct by official actions—is not unlike the development of new forms of action in England in the 12th and 13th Centuries to control the power of the church, rights in land and violence in the realm. *See* H. Berman, *Law and Revolution: The Formation of the Western Legal Tradition*, 445–57 (1983). Expansion of the "state action" concept after *Monroe* also has been a major force behind the ten-fold increase in the case loads of the federal courts since 1960 and behind the vast increase in the size of the federal judiciary. *See generally* Merritt, *Owen Fiss on Paradise Lost: The Judicial Bureaucracy in the Administrative State*, 92 Yale L.J. 1469, 1472–73 (1983).

Despite these dramatic consequences and despite the accretion of a vast body of case law on the subject, the idea of "state action" in § 1983 and the Fourteenth Amendment still is little more than an undifferentiated precept, not a developed conception with an understandable doctrinal structure. The courts have been unable to articulate a unifying principle, an understandable doctrine, a functionally helpful presumption, or even a cogent set of factors to aid us in evolving a coherent approach. The problem is "as fascinating as it seems to be intractable." Friendly, *The Public–Private Penumbra—14 Years Later*, 130 U.Pa.L. Rev. 1289, 1295 (1982). Twenty years ago the Supreme Court exhaustedly confessed that the effort to formulate neutral principles in this area was an "impossible task," *Reitman v. Mulkey*, 387 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L.Ed.2d 830 (1967); one noted scholar summarized the Court's performance as creating a "conceptual disaster area." Black, *The Supreme Court*

*1966 Term—Foreword: "State Action," Equal Protection, and California's Proposition Fourteen*, 81 Harv.L.Rev. 65, 95 (1967); *see also* L. Tribe, *American Constitutional Law* 1690 (2d ed. 1988).

Obviously, the courts developed the general idea of "state action" to carry out the framers' purpose of placing reasonable limits on the power of government. The framers of the original Constitution, the Bill of Rights, and the Civil War Amendments were skeptical of governmental power. Because the framers were anti-authoritarian and concerned about abuse of governmental power, the idea of "state action" seems necessary to separate private power and authority, upon which the framers placed no limits in the Constitution itself, from the public authority which they severely circumscribed.

At the time of the Constitutional Convention and the Civil War Amendments, it was fairly easy to tell the difference between private authority and public authority. Now with the proliferation of organizations and of new types of nonprofit, "quasi-public," and corporate institutions which enlist the machinery of government and the power of group politics, *see* M. Olson, *The Logic of Collective Action* (1965), or are created or recruited by government to accomplish its own ends, *see* Stewart, *Organizational Jurisprudence*, 101 Harv.L. Rev. 371, 379–80, 387–88 (1987), the distinction between public and private is often less clear.

Government at all levels through delegation has conferred its own authority on many of these organizations by granting them coercive powers, subsidies and tax exemptions. The "public-private" boundary is elusive, a moving target; its location seems to vary with the political philosophies of those in power and the means they choose to use that power. *See* Ackerman, *Foreword: Law in an Activist State*, 92 Yale L.J. 1083 (1983). How best to police these boundary organizations to guard against the abuse of power has so far received insufficient attention. Better legal theories are needed.

## II.

Judge Kennedy, in her opinion for the Court, sets out accurately the labels and the vocabulary employed in the "tests" which the courts historically have fashioned to distinguish state from private action: "symbiotic relationship," duties "fairly attributable to the state," public connections "sufficiently linked to the challenged actions," "such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." She then shows that in one previous case or another each of the isolated "links" in this case, standing alone—government funding of the agency, pervasive regulatory control of its activities, free use of office space in city hall, public officials holding one-third of the seats on the governing board, and statutory creation of the agency—has been held insufficient by itself to establish the necessary "symbiotic relationship."

Nothing is said about the effect of all these individual "links" taken together on the "symbiosis." The Court is unable to see the forest for the trees. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 361, 95 S.Ct. 449, 458, 42 L.Ed.2d 477 (1974) (Douglas, J., dissenting) ("not enough to examine *seriatim* each of the [state action] factors upon which a claimant relies.... It is the aggregate that is controlling.")

And there is something else missing: a full appreciation of the nature of the organization. The Human Development Corp. can be approximately described as a joint venture between local, state and national governments that have combined to create the agency, finance it, approve or expand its activities, and approve its personnel. The governments may also disapprove personnel or activities, cut off its funds or close it down. Indeed, the agency may not exist in a community if the local government is opposed. *See* Michigan Economic and Social Opportunity Act of 1981, Mich. Comp.Laws Ann. § 400.1108(c) (continued existence of local community action agency must be approved by the Director of the Michigan Bureau of Community Services and the "chief elected official of the unit of local government to be served").

If a Democratic mayor, for example, decided that the agency should fire all Republicans, it is difficult to see how the agency could long resist. Under the Court's reasoning, however, *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), would not apply to prohibit such a First Amendment violation because there would be no "state action" and therefore no federal interest.

The fact that our court can reach this result, so easily disregarding and never focusing on the potential for abuse of official power that this combination of factors creates, indicates the failure of the current vocabulary of "state action." That vocabulary to this point is composed entirely of malleable concepts, contractable and expandable depending on how the judge feels. These "tests" are all pigeonholes and labels; they lack clarity. In application, they provide the illusion of precision.

The Supreme Court recently decided *West v. Atkins*, —— U.S. ——, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), which appears to take a cautious first step toward a more "functional" and "context"-sensitive analysis of the state action requirement. *See id.* 108 S.Ct. at 2256–60. Justice Blackmun, who wrote *West* for eight members for the Court (Justice Scalia concurred separately), has elsewhere expressed his own dissatisfaction with the direction of earlier state action jurisprudence. *See* Blackmun, *Section 1983 and Federal Protection of Individual Rights—Will the Statute Remain Alive or Fade Away?*, 60 N.Y.U.L.Rev. 1 (1985).

Most significantly for our purposes, the opinion in *West* cautions that, in undertaking state-action analysis, we should be more concerned with the functional role played by a private party and the context of its relationship with the state, and less with the formal nature of its legal relationship to the State. The *West* Court thus held that a physician who provided medical care in state prisons as an independent contractor was a state actor.

### III.

A simple division is helpful. In some state-action cases it is clear that the party whose action must be characterized is an unquestionably *private* party in some way interacting with the State, as in *West*. In others it is equally clear that the action to be characterized is one of a party, either individual or institutional, whose previous history or role is not unquestionably private, but who previously functioned as a part of the government. This division suggests a preliminary inquiry that, unfortunately, the majority never undertakes: is the entity "private" or "public" *ex ante*?

The majority, never making this distinction, embraces precedents drawn from the realm of "private" state-action case law, *e.g.*, *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Crowder v. Conlan*, 740 F.2d 447 (6th Cir.1984). But these cases do not provide much help in the public-entity realm. The distinction is crucial, and, though not much developed, is nevertheless recognized by the Supreme Court. *See West v. Atkins*, 108 S.Ct. at 2257 n. 10; *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937–39, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982).

### A.

The Human Development Corp. is hardly *ex ante* private. For most of its history, it was a Community Action Agency created by federal law; since 1982, Michigan law has converted its status to the equivalent of a state agency.

The Tenth Circuit has described in detail the origin of community action agencies such as the HDC:

The concept of the community action agency originated in Title II of the Economic Opportunity Act of 1962 (the "EOA"), 42 U.S.C. §§ 2781–2837 (1976) (repealed 1981). Through the EOA's provisions, Congress sought to encourage the creation of community operated agencies that would coordinate federal, state, and private resources to combat

poverty at a local level. Congress defined the basic structure and functions of these agencies and established requisites for federal funding. *See* EOA §§ 210–221, 42 U.S.C. §§ 2790–2808. However, Congress left broad discretion to the local communities in the operation of the agencies. *See* H.R.Rep. No. 1458, 88th Cong., 2d Sess., *reprinted in* 1964 U.S. Code Cong. & Ad.News 2900, 2909.

Congress established a number of requirements of particular relevance to this appeal. It provided that "[a] community action agency shall be a State or political subdivision of a State ... or a combination of such political subdivisions, or a public or private nonprofit agency or organization which has been designated by a State...." EOA § 210(a), 42 U.S.C. § 2790(a). It also specified that "[n]o political subdivision of a State shall be included in the community action program of a community action agency designated under section 2790(a) of this title if the elected or duly appointed governing officials of such political subdivision do not wish to be so included." EOA § 210(e), 42 U.S.C. § 2790(e).

Congress set forth specific requirements for the governing board of the community action agencies, providing,

> Each Board to which this subsection applies shall consist of not more than fifty-one members and shall be so constituted that (1) one-third of the members of the board are elected public officials, or their representatives, except that if the number of elected officials reasonably available and willing to serve is less than one-third of the membership of the board, membership on the board of appointive public officials may be counted in meeting such one-third requirement....

EOA § 211(b), 42 U.S.C. § 2791(b). Regarding the authority of the board, Congress provided,

> The powers of every community action agency governing board shall include the power to appoint persons to senior staff positions, to determine major personnel, fiscal, and program policies, to approve overall program plans and pri-

orities, and to assure compliance with conditions of and approve proposals for financial assistance under this subchapter.

EOA § 211(e), 42 U.S.C. § 2791(e).

*Gilmore v. Salt Lake Community Action Program,* 710 F.2d 632, 633–34 (10th Cir. 1983) (footnotes omitted). In the early 1980's, the Reagan administration phased out the federal agency that administered the EOA and substituted a system of block grants. In 1982, Michigan enacted the Economic and Social Opportunity Act establishing the Bureau of Community Services within the State Department of Labor. Under the Act, the Bureau designates "community action agencies." Mich.Comp. Laws Ann. §§ 400.1105, 400.1108. A community action agency may be one of two types: (1) a *public* agency or unit of local government so designated by the corresponding local officials, § 400.1108(1)(a), (b), (d), or (2) a "nonprofit private agency" that has been "approved by the chief elected official of the unit[s] of local government to be served," § 400.1108(1)(c). The Act also grandfathers community action agencies previously part of the federal program. § 400.1108(3).

The Act further provides that a Michigan community action agency:

· fix the membership of its board of directors according to state standards. The board must have between 15 and 51 members. One third must be "low income, elderly, or handicapped consumers" living in the service area who are selected "through a democratic process pursuant to guidelines established by the department." § 400.1111(1). One third must be "representatives of the units of local government and public agencies within the service area." *Id.* One third must "represent the private sector, including representatives of business and industry, agriculture, labor, and religious and civic organizations" in the service area. *Id.*

· may annually apply for and receive state appropriations pursuant to a

"program budget request." § 400.1110.

· is subject to the Michigan public meetings act. § 400.1114(1).

· is subject to the Michigan freedom of information act. § 400.1114(2).

The majority correctly describes a community action agency's statutory purpose as to "serve as a primary advocate for the reduction of the causes, conditions, and effects of poverty" and the provision of "social and economic opportunities that foster self-sufficiency for low income persons." § 400.1109. The Act further empowers the agencies to "inform" other governmental agencies of the nature and extent of poverty problems, to provide training for the other agencies, to increase "interagency coordination and cooperation" and to "mobiliz[e] federal, state, and local public and private agencies and organizations." § 400.1109.

The entity thus was created by government, is sustained by government, is required to further government purposes, and cannot exist without government. It is strange indeed to characterize such an animal as "private," a real confusion of categories, like *The Man Who Mistook His Wife for A Hat* (Dr. Oliver Sacks, Summit Books, 1986), or the Greek goddess who mistook the Unicorn for a Centaur.

### B.

Identifying the agency as *ex ante* public does not end the analysis, of course. Even a flat-out state employee can be held to act as a private, not a state, actor. *See Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (public defender not state actor). If it can be shown that a "public" party's contested action is *not* motivated by State purposes but rather by wholly private purposes coincidentally possessed by that party, then there would be no state action. Otherwise, however, public action should be treated as state action.

In the case of The Human Development Corp., the dispositive inquiry should be: did director Vandemark act pursuant to state interests when she fired Adams and Panknin? The majority treats this case as if the two plaintiffs' discharges here were purely internal personnel disputes unrelated to the governmental purposes of the HDC. If true, that would be a different case, but that is not our case.

The majority does not describe the nature of the underlying disputes that precipitated the instant lawsuits beyond characterizing them as alleged firings in retaliation for exercise of First Amendment rights. Both Adams and Panknin alleged that Vandemark and the HDC sought to gain the use of each man's state builder's license so that the *agency* could use the license to take on construction programs for which it would otherwise be required to let contracts. When each man objected to that use of his license, he was fired.

In other words, the agency was to "profit" from the use of Adams' and Panknin's licenses. When the appellants objected, they were fired. That is the challenged action of which they complain.

The majority asserts instead that "the HDC's board's only link to the challenged actions, the discharges, is the board's adoption of the personnel policies pursuant to which Vandemark discharged [the appellants]." *Ante*, at 317. It is undeniable, however, that the board sets other policies of the HDC and that Ms. Vandemark sought the use of the appellants' license to further one of those other policies. She is the HDC's chief executive officer; her official actions presumably effectuate the organization's overall goals. Absent some showing that her actions did *not* further those purposes, I do not see how the actions of an organization's chief officer can be deemed not to represent the actions of the organization. Neither do I see how an organization whose governing board is statutorily composed of a significant percentage of public officials lacks governmental purpose, as Judge McKay wrote for the Tenth Circuit:

When public officials serve on a governing board of an institution, there is always some risk that the officials may advance governmental objectives through the institution. When the offi-

cials serve on the board to offer service and assistance *qua* governmental officials, when their presence on the board is a requirement for federal funding, and when the decisions of the board often involve issues of public interest, there exists a substantial risk that governmental objectives can influence institutional action. Accordingly, the institution becomes a state actor even if, as here, the public officials maintain only a minority representation on the governing board. The potential for government influence cannot be directly calibrated to the number of officials on the board; the officials, by virtue of the requirement of their presence and the power of their positions, can exercise influence far in excess of their proportional representation.

*Gilmore v. Salt Lake Community Action Program,* 710 F.2d at 637 n. 12.

In most cases, it will be relatively easy to identify whether an entity is *ex ante* private or *ex ante* public. To resolve those difficult cases created on the boundary, the following factors deserve consideration:

1. whether the behavior of the organization is likely to have significant effect on property or liberty interests of citizens;

2. whether its sources of funding and place of work are public or private;

3. the degree of public regulation;

4. the method of creation and permanence of organization;

5. the assumptions of the entity's employees and constituents about whether it is engaged in government activity;

6. the degree of control exercised over the organization's work by government officials;

7. whether the organization competes in the private marketplace, or whether the purpose of the organization is to alter the arrangement of the private marketplace as a result of government policy;

8. whether the organization's activity historically has been conducted by private or government actors; and

9. whether the organization and its employees should receive the protection of governmental and official individual immunities from liability.

The above is loosely adapted from the list developed by Professor Seavey and his successors for the *Restatement of Agency* from the case law to describe factors useful in determining whether "one acting for another is a servant or an independent contractor." *See Restatement (Second) of Agency* § 220 (1958).

Such a list is not exhaustive. Because principles of agency developed in private law do not necessarily transplant whole into areas suffused by public policies, *see City of St. Louis v. Praprotnik,* —— U.S. ——, 108 S.Ct. 915, 936, 99 L.Ed.2d 107 (1988) (Stevens, J., dissenting); Jaffe, *Suits Against Governments and Officers: Damage Actions,* 77 Harv.L.Rev. 209, 209–12 (1963), basic agency principles may need modification to take account of such phenomena as institutional power and collective or aggregate decisionmaking. *See* Ackerman, *Foreword: Law in an Activist State,* 92 Yale L.J. 1083 (1983); Mashaw, *"Rights" in the Federal Administrative State,* 92 Yale L.J. 1129 (1983); *see generally* D. Mueller, *Public Choice* (1979).

Applying these factors, the agency in question is engaged in a welfare program with the same risk of injury to property and liberty interests as other similar programs like Aid to Families with Dependent Children or the relief of farmers. Its funding is wholly public and its program highly regulated. Its purpose is to substitute a government program for the private marketplace. These factors in combination give governmental officials a large degree of control over the agency's activities.

I would reverse the District Court's grant of the motions for summary judgment and directed verdict.