### CONCLUSION

In summary, we find that none of the factors relied on by the district court is sufficient to warrant a finding of state action by Memphis in May under the nexus test. Moreover, neither of the other two available tests urged by Lansing -- the public function or the state compulsion test -- offers any more support for the theory of state action by Memphis in May. Based on these conclusions, we hold that the district court erred in finding that Memphis in May was a state actor.[4] This ruling, of course, moots the question of whether Memphis in May violated the plaintiff's First Amendment rights when it acted periodically to remove him from the liminal area of the festival. We therefore REVERSE the district court's judgment in Lansing's favor and VACATE the permanent injunction against Memphis in May. Because the plaintiff is no longer the prevailing party, there is no basis for assessing attorney's fees against the defendant, and the district court's order to the contrary is hereby VACATED. The case is REMANDED to the district court for further orders, as necessary.

---

[4] For a comparable conclusion by a sister circuit in a case presenting similar facts, *see United Auto Workers v. Gaston Festivals, Inc.*, 43 F.3d 902 (4th Cir. 1995).

---

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0042P (6th Cir.)
File Name:  00a0042p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KENNETH D. LANSING,
     *Plaintiff-Appellee,*

    *v.*       Nos. 98-5688/6743

CITY OF MEMPHIS; MEMPHIS PARK COMMISSION,
     *Defendants,*

MEMPHIS IN MAY INTERNATIONAL FESTIVAL, INC.,
     *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 97-03153—Jon Phipps McCalla, District Judge.

Argued:  November 3, 1999

Decided and Filed:  February 4, 2000

Before:  MARTIN, Chief Judge; DAUGHTREY, Circuit Judge; HILLMAN,* District Judge.

---

[*] The Honorable Douglas W. Hillman, United States District Judge for the Western District of Michigan, sitting by designation.

———————————

## COUNSEL

———————————

**ARGUED:** Thomas J. Walsh, Jr., FORD & HARRISON, Memphis, Tennessee, for Appellant. Nathan W. Kellum, McNABB, HOLLEY & WALDROP, Memphis, Tennessee, for Appellee. **ON BRIEF:** Thomas J. Walsh, Jr., Herbert E. Gerson, FORD & HARRISON, Memphis, Tennessee, for Appellant. Nathan W. Kellum, McNABB, HOLLEY & WALDROP, Memphis, Tennessee, for Appellee.

———————————

## OPINION

———————————

MARTHA CRAIG DAUGHTREY, Circuit Judge. After he was asked to move from an area near a festival in a city park, Kenneth D. Lansing, a self-identified "street preacher," filed federal and state constitutional claims against the City of Memphis, the Memphis Park Commission, and Memphis in May International Festival, Inc., alleging violations of his freedom of religion, speech, association, and assembly, and of his right to equal protection under the law. Following a consolidated hearing on the merits of Lansing's claim, the district court denied the defendants' motions for summary judgment and issued a permanent injunction barring each of the defendants from "prohibiting Mr. Lansing's expressive activities" within a specified area. Subsequently, the district court granted Lansing's motion for attorney's fees pursuant to 42 U.S.C. §1988.

Only Memphis in May has appealed the injunction, contending that it is not a state actor and therefore owes no First Amendment duties to Lansing, and alternatively, that if it does owe such duties, it did not impose any unreasonable restrictions on Lansing's speech. In a separate but consolidated appeal, Memphis in May argues that the award of attorney's fees should be reversed with respect to Memphis in May, on the grounds that the city has already paid

by the very party who later complained of their presence. 48 F.3d at 197. As noted, the Supreme Court has also held that merely availing oneself of state-sanctioned remedies or procedures, without more, does not render private action public. The facts here indicate that in every case, a Memphis in May representative first approached Lansing and asked him to move. He refused to leave unless a police officer ordered him to do so. The Memphis in May representative found an officer and asked for assistance, and the officer complied. If this were all that was required to find state action, then every private citizen who solicited the aid of the police in resolving disputes or in ejecting unwanted persons would be transformed into a state actor. A mere request for assistance from an available police officer cannot be sufficient to form a nexus between the state and the private action.

Furthermore, the letter to the director of police services from the city attorney's office regarding expressive activity near Memphis in May events in no way indicates a nexus between the city and Memphis in May's actions; in fact, it is the best evidence the record provides to show that Memphis in May and the city were operating as independent decision-makers during the festival. The letter is quite emphatic in communicating to city police officers the clear boundary between public forums controlled by the city, in which officers were directed to permit protected expressive activity, and the areas leased and controlled by Memphis in May. The city does not attempt to instruct its agents regarding activities by Memphis in May, or in areas controlled by Memphis in May. It merely clarifies the duties of officers in areas controlled by the city, stating that "[n]o matter how close individuals get to the described areas, as long as they do not cross the leased areas, they are permitted to engage in protected expressive activities." No public-private nexus is indicated.

the case at hand, there is no evidence that Memphis in May's board of directors or its executive committee had anything to do with the decision to ask Lansing to move outside the barricade, let alone that the two public officials on the executive committee exerted any undue influence over the decision-making of their seven colleagues. There cannot be any nexus between the state and Memphis in May's action based on the composition of Memphis in May's board.

Sixth, communications between the city attorney's office and Memphis in May regarding Lansing do not indicate that the city dictated Memphis in May's decision to remove Lansing. Certainly, here more than anywhere there is a link between acts fairly attributable to the state and acts taken by Memphis in May with regard to Lansing. However, scrutiny of the content of the correspondence reveals nothing more than an alert to the situation, an offer to assist, and a request to act cautiously in order to avoid a lawsuit. Nowhere in the letter from the city attorney's office to Memphis in May's attorney is there any language suggesting or requiring that Memphis in May eject Lansing from the festival; in fact, if anything, the letter counsels a rather more conservative approach, urging that Memphis in May "remember the balance" between constitutional rights and festival fun, and reminding planners that "borders for festival activities . . . can not infringe on protected constitutional rights." Although this single letter indicates that the city knew about Lansing's complaint against Memphis in May, and that it was concerned that the law be upheld, it does not indicate a nexus so close that Memphis in May's subsequent actions with respect to Lansing can be attributed to the state.

Finally, neither the supply of police officers to help enforce Memphis in May's decision to remove Lansing, nor the city's instruction to its officers not to interfere with expressive speech activity outside the leased space, indicates a nexus sufficient to attribute Memphis in May's actions to the state. In *Ellison v. Garbarino*, we held that police assistance in the lawful exercise of self-help does not convert private action to public action. In that case as here, the police were solicited

Lansing's fees in full, and alternatively, that Lansing is ineligible for attorney's fees under the statute once the district court's ruling on the merits is reversed.

After careful review of the factual record and the relevant law, we conclude that Memphis in May was *not* a state actor (rendering moot the constitutional question), and we therefore find it necessary to reverse the judgment of the district court. It follows that Memphis in May is not liable for the plaintiff's attorney's fees.

### *FACTUAL AND PROCEDURAL BACKGROUND*

Memphis in May International Festival, Inc. is a not-for-profit corporation qualified for tax exempt status under section 501(c)(3) of the Internal Revenue Code. Its stated mission is "to generate tourism, foster international commercial trade and enhance the quality of life in the Memphis-Mid-South area through the organization, production, and/or promotion of public activities and education programs focusing on foreign nations and diverse cultures." The corporation is run by a volunteer board of directors, which is itself governed by a nine-member executive committee. Two of the nine committee members are selected by city and county representatives.

In furtherance of its mission, Memphis in May organizes an annual festival held in Memphis during the month of May, known as "Memphis in May." The festival includes a number of events throughout the month; however, the three largest events sponsored by Memphis in May are the Beale Street Music Festival, the World Championship Barbecue Cooking Contest, and the Sunset Symphony. Each of these events is held on a different weekend in May in Tom Lee Park, and each routinely draws over 200,000 people.

Memphis in May receives funding for its festival from a variety of sources, including gate receipts, private contributions, sponsorships, and local government. In the years 1995 - 1997, Memphis in May's total revenues ranged from approximately $2.5 million - $3.9 million. During that

same time period, the combined public support from city, county and state governments ranged from 1.8% - 2.3% of total revenues. Gate receipts for that period totaled between 63.4% - 73.5% of revenues.

For each of the years 1995, 1996, and 1997, Memphis in May signed a lease agreement with the City of Memphis for Tom Lee Park and a park use agreement with the Memphis Park Commission, and requested and received a Memphis City Council resolution closing the streets surrounding the festival site to vehicular traffic. The substantive terms of these documents did not change in any material respect from year to year, with the exception of the park use agreement, which was revised for 1997. The property covered by the lease included "all curbs, sidewalks, and abutments and any other public property within, on the boundary, or immediately contiguous to the Property." According to the park use agreement (in all years), for the purpose of the Memphis in May events, "the boundaries of Tom Lee Park shall be: a. The tract of land west of Riverside Drive generally known as Tom Lee Park; b. Riverside Drive if closed to traffic . . . "

The lease further provides that "Lessee shall comply with the directives of the Memphis Police Department and the Memphis Fire Department to minimize interference with traffic in and out of said area so as not to create a nuisance" and "Lessee shall not create or allow any nuisance to exist on said property and to abate any nuisance that may arrive promptly and free of the expense of the Lessor . . . " The 1997 park use agreement states that "Applicant shall provide . . . Security and/or Traffic Control based on the guideline for 1,000-20,000 attendees of two (2) Officers per 1,000 and; 20,000 or more, one (1) additional Officer [p]er 1,000." The city council resolution included a clause stating: "BE IT FURTHER RESOLVED that in each case, streets will open before the time listed if the streets are cleared and approved by Memphis Police Department Traffic Bureau." Finally, the 1997 park use agreement provided that "[t]he applicant accepts responsibility for determining and complying with all applicable rules, regulations, ordinances, statutes , policies,

Fourth, the fact that the city required Memphis in May to coordinate with city agencies regarding the regulation of alcoholic beverages, advertising, traffic and security at the festival, far from establishing a nexus between them, in fact demonstrates the independence of their operations. By conditioning the lease, the use agreement, and the council resolution on  Memphis in May's compliance with city regulations and authorities, the city and Memphis in May clearly established separate spheres of responsibility for the festival period. Memphis in May was responsible for organizing the festival and making all appropriate administrative and logistic contacts, while Memphis retained responsibility for all the traditional functions of government, such as controlling traffic, maintaining security, and regulating alcohol consumption.

Furthermore, the level of regulation to which Memphis in May was subjected for a single month-long festival cannot compare with the degree of state regulation in enterprises such as insurance, schooling, worker's compensation, or electrical utilities. Yet, even in these extensively regulated arenas, the courts have been unwilling to find that state regulation alone is sufficient to impute the actions of the regulated entity to the state. *See*, *e.g.*, *American Manufacturers*, 119 S.Ct. 977; *Rendell-Baker*, 457 U.S. 830; *Blum*, 457 U.S. 991; *Jackson*, 419 U.S. 345; *Adams*, 855 F.2d 312; *Crowder*, 740 F.2d 447. Coordinating traffic control and security with city police is not a sufficient nexus to attribute Memphis in May's actions to the state.

Fifth, the presence of two public officials on the Memphis in May board in this case fails to satisfy the nexus test. In *Crowder v. Conlan*, this court held that even when a hospital board was responsible for the decision which resulted in the alleged civil rights violation, the presence of two pubic officials on the board of thirteen members was insufficient to create a close nexus between the board's decision and the state. 740 F.2d at 451. In *Adams v. Vandemark*, the court came to a similar conclusion regarding a board one-third of whose members were public officials. 855 F.2d at 317. In

that Lansing move outside the barricades.  *See*, *e.g.*, *Burton*, 365 U.S. at 724 (finding it significant that "profits earned by discrimination not only contribute to, but also *are indispensable elements in, the financial success of a government agency*" when holding that restaurant was state actor (emphasis added)).  There is no evidence in the record to indicate that any economic benefit the city received from Memphis in May's activities depended on the removal of Lansing from the festival.

Second, the fact that Memphis in May received a small part of its funding from government sources is not enough to convert its decisions to state action.  As noted, the Supreme Court and this circuit have held that even in cases where private entities received virtually all of their funding from the state, that fact alone was insufficient to establish a close nexus between the state and the activity of the private entity. In this case, the record indicates that Memphis in May never received more than 3% of its revenues from government sources during the period at issue.  Such limited public support is simply not enough to require that we impute Memphis in May's actions to the state.

Third, the fact that Memphis in May leased Tom Lee Park and contiguous public ways from the city does not convert it from a private to a state actor. We have been consistent in holding that a lease for public land or facilities from the government is insufficient evidence of a nexus between the state and the activities that take place on the land.  *See Wolotsky*, 960 F.2d at 1336;  *Adams*, 855 F.2d at 316; *Crowder*, 740 F.2d at 450, 453.  Nor is the fact that the city received a percentage of gross sales of beer indicative of a sufficiently close nexus between Memphis and Memphis in May.  While such an arrangement may have given the city an economic interest in the success of the beer vendors, nothing indicates any connection between beer sales and Lansing's presence in the liminal space.  *See Burton*, 365 U.S. at 724. This limited profit-sharing agreement is insufficient to impute Memphis in May's request of Lansing to the city.

and procedures of federal, state, county and city authorities and agencies."

Memphis in May events in Tom Lee Park are ticketed.  In order to enforce the ticket-admission policy, temporary barricades are erected around the event area, with entrance gates at the north and south ends of the park.  Beyond the event barricades are street barriers indicating that the streets contiguous to the park are closed to vehicles.  The area between the street barriers and the event barriers is open to the general public at no charge.  Vending and ticketing booths are located in this liminal space, as are check-in sites for members of the press and Memphis in May volunteers. Patrons of the festival also line up in this area as they wait their turn for admission.

Kenneth Lansing is a Christian who believes that he is discharging a duty to God by public proclamation and communication of his faith.  In fulfilment of this duty, Lansing seeks out public locations that have access to a maximum number of passers-by, where he engages in religious speech including preaching, counseling, handing out literature, and holding signs and banners.  In the years since 1989, Lansing has chosen areas near Memphis in May events in Tom Lee Park as a venue for his message.  His preferred location is an area on Riverside Drive, outside the north gate in the strip between the traffic barricades and the event barricades.  He chooses this area expressly because it affords him the best opportunity to reach the maximum number of people with his message.

Each year since 1995, during peak attendance periods, Memphis in May officials have asked Lansing to move from his chosen location to an area outside the traffic barricades, approximately 50-300 feet away.[1]  Lansing has responded

_____

[1]Lansing's complaint includes claims based on events occurring in 1995, 1996, and 1997. The district court ruled that the 1995 and 1996 claims were time-barred, presumably by Tennessee's one-year statute of limitations for "civil actions for compensatory or punitive damages, or

each time by indicating that he would move only at the request of a police officer. In each case a police officer was summoned to make the request, and Lansing moved without incident.

On May 29, 1996, Lansing's attorney initiated correspondence with city officials, seeking assurances that Lansing's perceived right to speak in the liminal area between barriers at the Memphis in May events would be protected. On July 31, 1996, the Memphis city attorney's office responded to Lansing's request, stating:

> The City of Memphis agrees that Mr. Lansing has certain constitutional rights to engage in protected speech. It is our position to ensure that for the 1997 Memphis in May Festival that we provide information to the festival organizers as well as to the Memphis Police Department regarding any limitations that may be placed on those who wish to engage in protected speech.

That same day, the city attorney's office wrote to Memphis in May's attorney, saying:

> The City Attorney's Office is willing to assist you and Memphis in May officials in determining what are constitutional legal boundaries for protected speech . . . All things considered it is imperative that there is better coordination between Memphis in May officials and the City to ensure that protected constitutional rights are not abridged . . . I would only ask that when negotiations are underway this year that you remember the balance between . . . competing interests when Memphis in May is drawing the borders for the festival activities. Those borders cannot infringe on protected constitutional rights.

both, brought under the federal civil rights statutes". T.C.A. § 28-3-104(a)(3). Although the incidents of 1995 and 1996 are outside the statutory period, many of the events described from that time period shed light on the question of whether Memphis in May operated as a state actor in 1997. Hence, a description of those events is included.

assistance of state officials' cannot [properly be considered state action]"); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 622 (1991) ("private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action"); *Ellison*, 48 F.3d at 197 (holding that police assistance in lawful exercise of self-help does not convert private action to state action).

The district court was correct in identifying several of the aforementioned nexus test factors as the relevant law for this case. Nevertheless, throughout its analysis of Memphis in May's relationship with the City of Memphis, the court drew conclusions that in many instances are in direct conflict with the principles identified above. As justification for its finding that Memphis in May was a state actor when it asked Lansing to move outside the traffic barricades, the court listed the economic benefit to the city of the festival; city and state funding of Memphis in May; Memphis in May's lease of city property and payment of fees for vendor's booths; city regulations regarding alcoholic beverages, advertising, traffic and security at the festival; the presence of two public officials on the Memphis in May board; communications between the city attorney's office and Memphis in May regarding Lansing; and the provision of police officers to help enforce Memphis in May's decision to remove Lansing. Although a common sense perusal of this list might suggest that Memphis in May and the city cooperated in the presentation of Memphis in May events, mere cooperation simply does not rise to the level of merger required for a finding of state action.

First, the fact that Memphis in May confers an economic benefit on the city by operating the festival is insufficient to establish that Memphis in May is a state actor. A great many private entities confer economic benefits on the state without their activities being imputed to the state; consider, as examples, major employers or home football teams. Furthermore, the test requires a close nexus not merely between the city and Memphis in May in general, but specifically between the city and Memphis in May's request

costs and paid medical expenses of more than 90% of patients); *Wolotsky*, 960 F.2d at 1336 (finding private not-for-profit corporation which derived "a significant portion of its funding from the government" and which leased one of its facilities from the government at nominal cost was not a state actor); *Adams*, 855 F.2d at 316 (holding private not-for-profit corporation was not a state actor, even though funded "almost entirely by public sources" and leasing office space from the city for a nominal fee); *Crowder*, 740 F.2d at 450, 453 (holding state was not responsible for private hospital's personnel decisions even if hospital derived "a considerable percentage of its revenues from government funding" and county was "owner and lessor of the hospital's physical plant").

The minority presence of public officials on the board of a private entity does not render the entity a state actor; nor does the mere approval or acquiescence of the state in private activity. *See*, *e.g.*, *Blum*, 457 U.S. 991 ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment"); *Jackson*, 419 U.S. 345 ("Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action'"); *Adams*, 855 F.2d 312 (holding private not-for-profit corporation was not a state actor, even though state law required one-third of its board to be public officials, since board had no direct involvement in challenged action); *Crowder*, 740 F.2d 447 (holding state was not responsible for private hospital's personnel decisions even if two of the thirteen board members were public officials).

Finally, the cases indicate that utilization of public services by private actors does not convert private action to state action. *See American Manufacturers*, 119 S.Ct. at 987 (holding that "a private party's mere use of the State's dispute resolution machinery, without the 'overt, significant

On April 25, 1997, Lansing's attorney again wrote to the city attorney's office requesting assurances that Lansing would be permitted to engage in religious speech activities "on Riverside Drive, as well as other public property" during the 1997 Memphis in May events. On May 2, 1997, the city attorney's office sent a letter to the director of police services, requesting that

[officers on duty during Memphis in May activities be] reminded that public streets and parks are public forums and individuals can engage in First Amendment activities without running afoul of the law so long as they do not present a danger to themselves or others or impede traffic . . . This is a special situation because Memphis in May officials have leased space from the City for a limited time . . . No matter how close individuals get to the [leased] areas, as long as they do not cross the leased area, they are permitted to engage in protected expressive activities.

Finally, on the same day, the city attorney's office wrote to Lansing's attorney, including a description of the leased area and saying: "Your client should feel free to engage in protected expressive activities, within the confines of the law, in the areas that are not included in the attached description."

On at least two different occasions that May, Lansing appeared outside the entrance gates of the Memphis in May festival, in the space between barricades, and began preaching, counseling, leafleting and holding signs. When, after some time, Memphis in May representatives asked him to move off the leased property, he responded that he would only move at the request of a police officer. An officer was summoned and made the request, and Lansing moved.

In December 1997, Lansing filed suit pursuant to 42 U.S.C. §§ 1983 and 1988 against the City of Memphis, the Memphis Park Commission, and Memphis in May, alleging violations of his state and federal constitutional rights. He sought declaratory and injunctive relief and damages. Subsequently, the City of Memphis (for itself and on behalf of its

subdivision, the Memphis Park Commission) and Memphis in May both filed summary judgment motions. In April, the court entered judgment for Lansing and permanently enjoined all defendants "from prohibiting Lansing's expressive activities within the leased areas of Riverside Drive outside the north and south gates." In his memorandum and opinion and order, the district judge made the following conclusions of law:

!   Lansing's claims with respect to events occurring in 1995 and 1996 were time-barred, and only the events of May 1997 were properly before the court.

!   The City of Memphis and its subdivision the Memphis Park Commission "actively participated in barring Mr. Lansing's speech," and hence there was state action on the part of the city.

!   The nexus between the activities of the city and of Memphis in May was sufficiently close to attribute the action of Memphis in May to the state, and hence there was state action on the part of Memphis in May.

!   Lansing's speech warranted protection under the First Amendment.

!   The area between the event barriers and the traffic barriers was a traditional pubic forum.

!   The defendants' restrictions on Lansing's speech were *not* narrowly tailored to serve a significant government interest, *nor* did they leave open ample alternative channels of communication.

!   Injunctive relief was appropriate, but since Lansing did not present proof as to damages, damages would not be awarded.

In the wake of the district court's ruling, Memphis in May filed its notice of appeal, and Lansing moved for an award of attorney's fees, pursuant to 42 U.S.C. § 1988. Each of the

a positive test cannot be adequately formulated in the abstract, both this circuit and the Supreme Court have nevertheless identified some factors which are decidedly *in*sufficient, by themselves, to justify a finding of a close nexus between the state and a private actor.

Consequently, it is now well-established that state regulation, even when extensive, is not sufficient to justify a finding of a close nexus between the state and the regulated entity. *See*, *e.g.*, *American Manufacturers*, 119 S.Ct. 977 (holding that despite location in state's "regulatory web," private insurer's decision to withhold payment for disputed worker's compensation claim not attributable to the state); *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) (holding private school's personnel decisions not attributable to the state, despite "extensive regulation of the school generally"); *Blum v. Yaretsky*, 457 U.S. 991 (1982) (refusing to hold New York State responsible for nursing home's patient transfer decisions, "although it is apparent that nursing homes in New York are extensively regulated"); *Jackson*, 419 U.S. 345 (refusing to find state action in electric company's decision to terminate service, notwithstanding that it was "a heavily regulated utility with at least something of a governmentally protected monopoly"); *Adams v. Vandemark*, 855 F.2d 312 (6th Cir. 1988) (holding private not-for-profit corporation was not a state actor, even though subject to state and federal regulation); *Crowder v. Conlan*, 740 F.2d 447 (6th Cir. 1984) (holding state was not responsible for private hospital's personnel decisions even if state regulation was "extensive and detailed").

Equally well-established is the principle that neither public funding nor private use of public property is enough to establish a close nexus between state and private actors. *See*, *e.g.*, *Rendell-Baker*, 457 U.S. 830 (finding private school's personnel decisions not attributable to the state, despite the fact that "virtually all of the school's income was derived from government funding'"); *Blum*, 457 U.S. 991 (refusing to hold New York state responsible for nursing home's patient transfer decisions, even though the state subsidized operating

*Wolotsky*, 960 F.2d at 1335.  Lansing urges that this test is met here, since the city attorney's office corresponded with Memphis in May's attorney regarding Lansing, and because city police officers asked Lansing to move from the liminal area.  However, neither of these actions imply "such coercive power" that the choice of Memphis in May to request that Lansing move outside the traffic barricades must "in law" be deemed that of the city.

The record indicates only one letter from the city attorney's office to Memphis in May's attorney, which includes simply an offer to assist in the determination of "constitutional legal boundaries for protected speech," and a request to consider the issue when planning the next year's event.  This is hardly "significant encouragement" of Memphis in May's decision to ask Lansing to leave; in fact, if anything, it seems to encourage the opposite result.  Furthermore, the involvement of Memphis police officers in Lansing's removal from the liminal space occurred solely at *Lansing's* own request.  Again, this can hardly be seen as an exercise of "coercive power" over Memphis in May by the city; but for Lansing's insistence, the city would not have been involved at all.  We therefore conclude that the state compulsion test is not met.

### c.  The Nexus Test

Under the nexus test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Wolotsky*, 960 F.2d at 1335. The cases establish no clear standard for identifying a "sufficiently close nexus."   Rather, the Supreme Court reminds us that "readily applicable formulae may not be fashioned" for finding state action in civil rights cases; such a finding "can be determined only in the framework of the peculiar facts or circumstances present."   *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 726 (1961); *see also Lugar*, 457 U.S. 922, 939 (calling the state action determination a "necessarily fact-bound inquiry").  Although

defendants opposed the motion for attorney's fees, arguing that the district court should not rule on it until the pending appeal on the merits was resolved.  However, the district court entered an order granting Lansing's motion; Memphis in May filed its notice of appeal of that order as well; and the two appeals have now been consolidated.  In the meantime, the City of Memphis has paid Lansing the full amount of attorney's fees sought in his post-judgment motion.

### DISCUSSION

Pursuant to Fed. R. Civ. P. 52(a), findings of fact by a district judge are not reversed unless "clearly erroneous." *Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 990 F.2d 865, 870 (6th Cir. 1993). We review de novo conclusions of law and mixed questions of law and fact. *Golden v. Kelsey-Hays Co.*, 73 F.3d 648, 653 (6th Cir. 1996); *Sandler v. All Acquisition Corp.*, 954 F.2d 382, 384-5 (6th Cir. 1992).

### State Action Requirement

It is undisputed that First and Fourteenth Amendment protections, codified in 42 U.S.C. § 1983, are triggered only in the presence of state action and that a private entity acting on its own cannot deprive a citizen of First Amendment rights. *See*, *e.g.*, *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149 (1978) ("most rights secured by the Constitution are protected only against infringement by governments"); *Hudgens v. NLRB*, 424 U.S. 507 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state."). Memphis in May contends that the district court erred when it ruled that Memphis in May, despite its status as a private corporation, operated as a state actor in ejecting Lansing from the area between the barricades.

However, a private entity can be held to constitutional standards when its actions so approximate state action that they may be fairly attributed to the state. *See*, *e.g.*, *American Manufacturers Mutual Insurance Co. v. Sullivan*, 119 S.Ct. 977, 985 (1999); *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S.

922, 937 (1982). The Supreme Court in *Lugar* identified a two-part approach to the question of "fair attribution,"effectively requiring that the action be taken (a) under color of state law, and (b) by a state actor. *See Lugar*, 457 U.S. at 937. In this circuit we have applied three tests to help in determining when the *Lugar* conditions are met. These are: (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. *See*, *e.g.*, *Brentwood Academy v. Tennessee Secondary Schools Athletic Association*, 180 F.3d 758, 763 (6th Cir. 1999); *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995); *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir. 1992). Each should be considered in turn.

### a.  The Public Function Test

The public function test requires that "the private entity exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain." *Wolotsky*, 960 F.2d at 1335 (internal citations omitted). *See also Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974) (holding that provision of utility service is *not* a power reserved exclusively to the state).

Lansing asserts that in the operation of its festival, Memphis in May maintained control over the public streets surrounding Tom Lee Park, a function usually reserved to the city. We need not reach the question of whether control of city streets is a public function in the tradition of eminent domain and public elections, however, because Lansing fails to establish that Memphis in May actually had exclusive control of the streets surrounding the festival. Although it is true that Memphis in May was the lessee and/or licensee of the streets in question and, as such, exercised more control over them than the average citizen,[2] it is also true that an

---

[2]*See*, *e.g.*, the park use agreement, by which Memphis in May "accepts responsibility for determining and complying with all applicable rules, regulations, ordinances, statutes, policies, and procedures of federal, state, county and city authorities and agencies." While every

express condition of both the lease and the park use agreement was that Memphis in May would "comply with the directives of the Memphis Police Department and the Memphis Fire Department to minimize interference with traffic in and out of said area" and "provide . . . Security and/or Traffic Control based on the guideline" furnished by the city agency. Additionally, according to the city council resolution, "streets will open before the time listed if the streets are cleared and approved by Memphis Police Department Traffic Bureau." These provisions indicate quite clearly that although Memphis in May had permission from the city to put its streets to special use during the time of the festival, the city retained ultimate control of the streets at all times. The City of Memphis, not Memphis in May, made the decision to close Riverside Drive to traffic, and the City of Memphis retained decision-making authority over issues of traffic control and safety. There is nothing in the record to indicate that Memphis in May usurped "powers which are traditionally exclusively reserved to the state" by applying for and receiving permission to put the street to a special, limited use.[3] Hence, we conclude that the public function test is not met here.

### b. The State Compulsion Test

The state compulsion test requires that a state "exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state."

---

citizen must comply with the law, perhaps not every user of Tom Lee Park is expected to *determine* the applicable law.

[3]Lansing also asserts, in the alternative, that "Memphis in May sets itself up as decision-maker, judging who can be on Riverside Drive and who can speak on that street. It is precisely this authoritative role that subjects Memphis in May to constitutional scrutiny." This argument begs the question, however. If Memphis in May is found to be a private actor, it *can* judge who can speak on Riverside Drive without constitutional scrutiny.