NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0398n.06

Case No. 22-1856

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>ELEANOR CANTER,</td><td>)</td><td></td></tr>
<tr><td>Plaintiff - Appellant,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>v.</td><td>)<br>)</td><td>ON APPEAL FROM THE UNITED<br>STATES DISTRICT COURT FOR<br>THE WESTERN DISTRICT OF<br>MICHIGAN</td></tr>
<tr><td>DISABILITY NETWORK WEST MICHIGAN,<br>et al.,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>Defendants - Appellees.</td><td>)<br>)</td><td>OPINION</td></tr>
</table>

**FILED**
Aug 31, 2023
DEBORAH S. HUNT, Clerk

Before: GIBBONS, READLER, and DAVIS, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Eleanor Canter believed that a building in Muskegon, Michigan did not have the number of publicly accessible entrances required by the Americans with Disabilities Act (the "ADA"). She argued that the defendants-appellees in this case—the City of Muskegon (the "City"), its city manager, and a building inspector for the City (together the "City Defendants"), Disability Network West Michigan ("DNWM") and two of its employees (together the "DNWM Defendants"), and Gary Post, the building's developer— engaged in a nefarious scheme to pretend otherwise. DNWM filed a lawsuit in state court alleging that Canter's criticism crossed the line into defamation. After DNWM voluntarily dismissed that lawsuit, Canter filed this case in federal court, claiming primarily that the state court lawsuit constituted retaliation in violation of the First Amendment, ADA, and Rehabilitation Act. The district court granted summary judgment to all defendants-appellees. We affirm.

I.

Heritage Square Commons ("HSC") is a mixed-use real estate complex in Muskegon, Michigan. Defendant-appellee Gary Post was the developer for HSC through a limited liability company of which he was the sole member. Among HSC's retail businesses is Drip Drop Drink, a coffee shop (the "Store"). The Store has a main public entrance that is not accessible to disabled individuals who use mobility devices because it is elevated by a single step above the sidewalk level and there is no ramp. The Store also has an accessible entrance that leads into the Store via a corridor.

Defendant-appellee Kirk Briggs worked "as a chief building official and building inspector" for Safebuilt, a private building inspection company that contracted with the City. DE 106-4, Br. in Support of Mot. for Summ. J. Ex. 4, Briggs Decl., Page ID 929. Defendant-appellee Franklin Peterson is the City's manager.

In late 2018, plaintiff-appellant Eleanor Canter, who uses a mobility device to walk, sent an email to Briggs and Peterson saying that she went to the Store and it "does not appear to have an accessible entrance." DE 115-6, Resp. in Opp'n to Mot. for Summ. J. Ex. F, Page ID 1606. Briggs forwarded Canter's message to Post, who promised to remind the owners of the Store to keep the accessible entrance unlocked during business hours. The next day, Post relayed to Briggs that he talked to someone at the coffee shop and was assured that the doors leading to the corridor and coffee shop would be open during business hours.

Two weeks later, the City held an event at the Store focused on relations between the police and the community. The accessible entrance was locked when Canter tried to attend that event.

In Canter's view, the design of HSC violated applicable ADA regulations. *See* 36 C.F.R. Pt. 1191, App. C, F206.4.1; 36 C.F.R. Pt. 1191, App. B., § 206.4.1. Canter expressed that view in an email to Briggs and Peterson, challenging Briggs's position that HSC was ADA-compliant.

After exchanging more emails with Briggs and Peterson, Canter emailed Post to ask whether he had a plan for ADA compliance at HSC. Post informed Canter that he had recently met with Briggs and defendant-appellee Brad Hastings from DNWM. DNWM is a nonprofit, federally designated center for independent living that receives some federal and state funds. As relevant here, DNWM provides accessibility reviews for businesses in which it identifies barriers to access for disabled individuals and suggests how to address those barriers. DNWM normally charges $350 to conduct an accessibility review. Hastings is DNWM's Advocacy and ADA Coordinator. In Post's email to Canter about his meeting with Briggs and Hastings, Post said that Briggs and Hastings agreed with him that HSC was ADA-compliant. Canter then emailed Hastings directly to ask whether Post's description of the meeting was correct. She also responded to Post to notify him that she would further pursue her rights under the ADA.

Hastings forwarded Canter's message to his supervisor, defendant-appellee Diane Fleser, the Chief Executive Officer of DNWM. Because Hastings considered Post's description of the meeting not fully accurate, he and Fleser coordinated a response to Canter that avoided responding to Canter's concerns regarding compliance with the minimum standards under the ADA, instead reiterating that those minimum guidelines do not "ensure that a business is disability-friendly." DE 115-23, Resp. in Opp'n to Mot. for Summ. J. Ex. W, Page ID 1647. Canter continued to send emails to Post, Briggs, Peterson, Hastings, and Fleser strongly denouncing their position that HSC was ADA-compliant and accusing them of ulterior motives.

Eventually, Canter also made her views known to others. For example, Canter sent an email to several City officials characterizing DNWM as a "criminal enterprise" that was "selling falsified access reviews for cash payments," an arrangement that "look[ed] a lot like a payoff to avoid the City's responsibilities under the law in exchange for a promise not to report violations" and "border[ed] on serious corruption." DE 103-14, Mot. for Summ. J. Ex. 13, Page ID 698. Canter also made a post on her public Facebook page similarly saying that DNWM "is *selling access reviews* . . . and promising not to report violations of state and federal law in exchange for cash." DE 103-15, Mot. for Summ. J. Ex. 14, Page ID 700. In response to a comment on the post, Canter stated that DNWM "sell[s] fraudulent access reviews to anyone who pays them off." *Id.* at 701. And Canter sent an email to the Muskegon Community Foundation using verbiage identical to that of her Facebook post and asking it to "withdraw [its] support" for DNWM. DE 103-16, Mot. for Summ. J. Ex. 15, Page ID 711.

DNWM first sent Canter a letter asking her to cease and desist from making such accusations against it. DNWM later filed a complaint against Canter in a Michigan state court asserting a single count of defamation. It eventually voluntarily dismissed that lawsuit. Before this, DNWM contracted with the City for $7,500 "to assist the city with an accessibility audit, as well as technical assistance during the design process on various city/community projects." DE 115-41, Resp. in Opp'n to Mot. for Summ. J. Ex. OO, Page ID 1717–18.

Canter filed this lawsuit in federal court against the City Defendants, the DNWM Defendants, and Post, asserting that they retaliated against her and interfered with her protected advocacy in violation of the First Amendment, the ADA and Rehabilitation Act, and Michigan's Persons with Disabilities Civil Rights Act. The City Defendants and the DNWM Defendants moved for summary judgment. Post did not file his own motion for summary judgment but did

join the arguments of the other defendants-appellees as they applied to him. The district court granted summary judgment to all defendants-appellees as to the federal claims and declined to exercise supplemental jurisdiction over the state law claims. Canter timely appealed.

II.

We review the district court's grant of summary judgment de novo. *Equitable Life Assur. Soc'y of the U.S. v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998). Summary judgment is properly granted if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "view the factual evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor." *Burwell v. City of Lansing*, 7 F.4th 456, 462 (6th Cir. 2021) (quoting *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008)).

III.

Canter first argues that the district court erred when it granted summary judgment to the City Defendants and Post as to her claims of retaliation under the First Amendment, ADA, and Rehabilitation Act. The elements of a First Amendment retaliation claim are "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection" between the protected conduct and the adverse action. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). A retaliation or interference claim under the ADA or Rehabilitation Act similarly requires some act retaliating against or interfering with the plaintiff's protected activity.[1] *Johnson v. Cleveland City Sch. Dist.*, 344 F. App'x 104, 113 (6th Cir. 2009) (quoting

---

[1] Because Canter does not differentiate between retaliation and interference, much less rely on any such distinction to argue that an interference claim could succeed even where a retaliation claim

*Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009)) (ADA retaliation); *Post v. Trinity Health-Mich.*, 44 F.4th 572, 576 (6th Cir. 2022) (ADA interference); *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (Rehabilitation Act retaliation).

On appeal, Canter offers two theories of retaliation. First, she says that all defendants-appellees were "intentionally misleading while meticulous in their efforts to avoid answering [Canter's] questions" about ADA compliance at HSC.[2] CA6 R. 33, Appellant Br., at 36. That does not amount to an adverse action. For First Amendment purposes, "[a] citizen's right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views."[3] *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999). Similarly, pursuant to the ADA and Rehabilitation Act, mere failure to grant a plaintiff's request to correct a condition that the plaintiff perceives as violating the statute does not constitute retaliation; otherwise, every discrimination claim would also be a retaliation or interference claim. *See, e.g.*, *Rorrer v. City of Stow*, 743 F.3d 1025, 1043–45, 1046-47 (6th Cir. 2014) (reversing grant of summary judgment as to failure-to-accommodate claim but affirming as to retaliation claim); *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997) (rejecting retaliation claims that were "nothing more than a reformulation of [the plaintiff's] failure to

---

might fail (or vice versa), we do not consider any potential differences between retaliation and interference under the ADA.

[2] In a variation on this theme, Canter suggests that the defendants-appellees conspired "to attack Canter's character and credibility—portraying her advocacy as something more akin to harassment or threats." CA6 R. 33, Appellant Br., at 25. However, Canter does not argue or cite record evidence that any of the defendants-appellees characterized her that way in public, or indeed to anyone except each other, or that they revealed any confidential information about her to the public. *Cf. Bloch v. Ribar*, 156 F.3d 673, 681 (6th Cir. 1998) (sheriff's public revelation of confidential and humiliating details of rape constituted adverse action).

[3] This analysis assumes that the City, Peterson, and Briggs are all state actors for purposes of Canter's First Amendment claims. None of them argues that they are not.

accommodate claims"). Moreover, there is no evidence that the City Defendants' position that HSC was ADA-compliant was motivated by a desire to retaliate against Canter. *See Thaddeus-X*, 175 F.3d at 394 (requiring "causal connection" between protected activity and adverse act).

Second, Canter argues that all defendants-appellees were involved in DNWM's decision to file a lawsuit against her for defamation. But there is no evidence that the City Defendants had anything to do with DNWM's lawsuit against Canter. Canter attempts to tie the City Defendants to DNWM's lawsuit in several ways. She refers to a supposed "promise of false testimony" in support of DNWM's lawsuit by Peterson, Briggs, or both. *See* CA6 R. 33, Appellant Br., at 56. But there is no basis in the record for Canter's claim that Peterson or Briggs ever promised DNWM that they would testify in support of DNWM's lawsuit. The only record citation that Canter provides says that Briggs told *Canter* that HSC was ADA-compliant. *See id.* at 57 (citing DE 115-47, Resp. in Opp'n to Mot. for Summ. J. Ex. UU, Page ID 1787).

Canter also argues that the true purpose of the City's $7,500 contract with DNWM was to fund DNWM's lawsuit. *Id.* at 63. Again, however, Canter cites no record evidence in support of this claim. On the contrary, the City's contract with DNWM is facially unconnected to the HSC project at issue in this case.

Canter argues that DNWM's oblique reference to "those connected to" DNWM in its cease-and-desist letter included the City Defendants, and that DNWM asked for relief that would also benefit the City in its state court complaint. CA6 R. 33, Appellant Br., at 53–54 (quoting DE 115-43, Resp. in Opp'n to Mot. for Summ. J. Ex. QQ, Page ID 1737). Even if Canter's somewhat speculative interpretation of DNWM's words is correct, it does nothing to establish that the City Defendants themselves took an adverse action against Canter.

Finally, Canter argues that DNWM's meeting minutes indicate that it intended to "connect with [the] City of Muskegon attorney" regarding the legal steps it was taking against Canter. *See* CA6 R. 33, Appellant Br., at 52 (citing DE 115-35, Resp. in Opp'n to Mot. for Summ. J. Ex. II, Page ID 1701). There is no further evidence that DNWM even followed through with this planned attempt at contact. But again, assuming it did, it is still sheer speculation to conclude that the City Defendants consequently did anything to encourage or facilitate DNWM's lawsuit against Canter. Thus, Canter fails to create a genuine dispute as to whether the City Defendants took an adverse action against Canter.

Canter's claims against Post fail for much the same reason: there is no evidence that Post took any adverse action against Canter. Even if Canter is correct that HSC violated the ADA's requirements, Post's mere failure to correct that situation does not constitute an adverse action. *See Penny*, 128 F.3d at 417. Moreover, the record contains no evidence that Post failed to correct any ADA violation at HSC out of retaliatory animus against Canter. The record also contains no evidence that Post had anything to do with DNWM's lawsuit against Canter.

Nevertheless, Canter argues that the district court ran afoul of Federal Rule of Civil Procedure 56 in granting summary judgment to Post because Post did not move for summary judgment himself but rather only joined in the motions for summary judgment filed by the other defendants-appellees. Canter's argument is meritless. District courts have broad discretion to manage their dockets. *See ACLU of Ky. v. McCreary Cnty.*, 607 F.3d 439, 451 (6th Cir. 2010). Canter cites no authority for the proposition that that discretion does not include allowing a defendant to join another defendant's motion for summary judgment rather than filing a duplicative motion. Considerations of judicial economy would seem to militate against any such requirement. In any event, "district courts are widely acknowledged to possess the power to enter summary

judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). In this case, Canter was on notice to come forward with all of her evidence against Post because Canter knew that Post had joined in the other defendants' motions for summary judgment.

For these reasons, we affirm the district court's grant of summary judgment to the City Defendants and Post.

IV.

Canter also argues that the district court erred when it granted summary judgment to the DNWM Defendants as to her First Amendment retaliation claim. "[A] private entity acting on its own cannot deprive a citizen of First Amendment rights." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). But a private actor may be subject to a First Amendment retaliation claim if "its actions so approximate state action that they may be fairly attributed to the state." *Id.* This may be the case if the private actor performs a public function, acts under state compulsion, or has a "symbiotic relationship or nexus" to state actors for purposes of the conduct at issue. *Id.*

On appeal, Canter does not contend that DNWM itself is a state actor. Canter also does not argue, and the record would not support, that DNWM was either performing a public function or acting under state compulsion when it filed the state court lawsuit against her.[4] Instead, Canter's only argument on appeal is that DNWM filed the state court lawsuit as part of a conspiracy with the City Defendants, which can be construed as a theory of "symbiotic relationship or nexus." *Lansing*, 202 F.3d at 828. Canter's argument fails because, as discussed above, there is no record evidence that the City Defendants had any involvement in DNWM's lawsuit.

---

[4] For the reasons discussed above, Canter's theories of retaliation based on DNWM's mere refusal to accept her position that HSC was not ADA-compliant are unavailing.

Nevertheless, Canter argues that this case is like *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), in which evidence did not refute allegations that a police officer encouraged a store employee to deny service based on race. *Id.* at 158. Yet unlike in *Adickes*, in this case there is no evidence that any of the City Defendants encouraged any of the DNWM Defendants to file a lawsuit against Canter. We therefore affirm the district court's grant of summary judgment to the DNWM Defendants on Canter's First Amendment retaliation claims.

V.

Finally, Canter argues that the district court erred when it granted summary judgment to the DNWM Defendants as to her statutory retaliation claims under the ADA and Rehabilitation Act. The DNWM Defendants counter that a lawsuit can only constitute retaliation in violation of the ADA and Rehabilitation Act if the lawsuit is "objectively baseless." CA6 R. 47, Appellee Br., at 20–23 (quoting *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 524–25 (2002)). The Supreme Court has held that this standard applies in the context of National Labor Relations Act ("NLRA") retaliation claims, primarily because a broader standard would risk running afoul of the First Amendment's Petition Clause. *BE & K*, 536 U.S. at 531; *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 744 (1983). We have not explicitly held that the same standard applies to retaliatory lawsuits under the ADA and Rehabilitation Act, specifically. But we have recognized that, "under the *Noerr-Pennington* rule of statutory construction, we must construe federal statutes so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause unless the statute clearly provides otherwise." *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 615 (6th Cir. 2009) (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006)).

Under this standard, which we assume to apply because Canter has not argued otherwise, Canter cannot prevail on her claim that DNWM's lawsuit constitutes actionable retaliation against

her. DNWM's lawsuit was not objectively baseless. Under Michigan law, defamation has the following elements: "a false and defamatory statement concerning the plaintiff," "an unprivileged communication to a third party," "fault amounting to at least negligence on the part of the publisher," and "either actionability of the statement irrespective of special harm [defamation per se] or the existence of a special harm caused by publication [defamation per quod]." *Nichols v. Moore*, 477 F.3d 396, 399 (6th Cir. 2007) (quoting *Rouch v. Enquirer & News of Battle Creek*, 487 N.W.2d 205, 211 (Mich. 1992)). DNWM had an objective basis to believe that its defamation lawsuit against Canter could satisfy each of these elements.

Canter's public statements viewable on her Facebook page included accusing DNWM of "promising not to report violations of state and federal law in exchange for cash" and "sell[ing] fraudulent access reviews to anyone who pays them off." DE 103-15, Mot. for Summ. J. Ex. 14, Page ID 700-01. DNWM had reasonable grounds to argue that these statements were "false and defamatory," that Canter had "communicat[ed]" them "to a third party" on her Facebook page, and that Canter made these statements carelessly without regard for the possibility that they might be false. *Rouch*, 487 N.W.2d at 211. Moreover, DNWM had reasonable grounds to argue that Canter's comments constituted either defamation per se, because they accused DNWM of potentially illegal conduct, *see Burden v. Elias Bros. Big Boy Rests.*, 613 N.W.2d 378, 381 (Mich Ct. App. 2000), or defamation per quod, because her speech caused DNWM reputational harms and because DNWM incurred costs in responding to it, *see Rouch*, 487 N.W.2d at 211. DNWM might not have ultimately prevailed, but its lawsuit was not frivolous.

Canter argues that DNWM's lawsuit was objectively baseless because Canter's statements concerned a public figure and matters of public concern, and they were not "deliberately or recklessly false." CA6 R. 50, Reply Br., at 8 (quoting *See v. City of Elyria*, 502 F.3d 484, 495 (6th

Cir. 2007), and then quoting *Westmoreland v. Sutherland*, 662 F.3d 714, 721 (6th Cir. 2011)). Even assuming Canter is correct that this higher standard applies, DNWM had an objective basis to believe that Canter's falsehoods were deliberate or reckless. More specifically, DNWM had a plausible argument that Canter made inflammatory factual statements about DNWM without any supporting evidence despite knowing or recklessly disregarding a high probability that her statements were false. To be sure, Canter could have made substantial counterarguments of her own. But the question was not so one-sided as to render DNWM's lawsuit objectively baseless.

Canter also suggests that the DNWM Defendants are "precluded" from relitigating whether DNWM's state court lawsuit had merit because it voluntarily dismissed that lawsuit. CA6 R. 50, Reply Br., at 7. "Issue preclusion applies '(1) when the issue presently asserted was actually litigated in an earlier trial, (2) when it was actually and necessarily determined by a court of competent jurisdiction, and (3) when preclusion in the second trial does not work an unfairness.'" *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 840 n.3 (6th Cir. 2000) (quoting *United States v. Berman*, 884 F.2d 916, 922 (6th Cir. 1989)).

Canter's issue preclusion argument fails. Because DNWM voluntarily dismissed its lawsuit, the state court never determined whether its defamation claim had merit. Even if the state court had determined that DNWM's claim was not meritorious, that would not have meant that its lawsuit was objectively baseless for purposes of a federal statutory retaliation claim.

For these reasons, we affirm the district court's grant of summary judgment to the DNWM Defendants on Canter's ADA and Rehabilitation Act retaliation and interference claims. Because we affirm the district court's grant of summary judgment to all defendants-appellees on all of Canter's federal claims, and because Canter does not separately challenge the district court's

decision not to exercise supplemental jurisdiction over her state law claims, we also affirm the district court's decision to dismiss Canter's state law claims without prejudice.

VI.

We affirm.