JjGREMILLION, Judge.
These appeals concern the trial courts’ finding that the defendant, Southwest Louisiana Hospital Association d/b/a Lake Charles Memorial Hospital (Memorial Hospital), failed to provide the plaintiff, Dr. Rita Rae Fontenot, procedural due process and then' sexually discriminated against her by refusing to properly process her application for staff and surgical privileges. For the following reasons, we *1113 affirm in part; reverse in part; and render.
FACTS
Dr. Fontenot, a podiatrist, enjoyed temporary privileges at St. Patrick Hospital until her termination on September 26, 1988. Her application for privileges was officially denied by St. Patrick on December 15, 1988. She later filed suit against it based on this termination. On December 14, 1988, Dr. Fontenot submitted an application for staff and surgical privileges and a $100 processing fee to Memorial Hospital. This application included a signed authorization by Dr. Fontenot allowing Memorial Hospital to obtain information pertaining to her past professional and personal character and her past professional competency.
The February 1, 1989 minutes of Memorial Hospital’s surgical department indicate that Dr. Fontenot’s application was reviewed; however, the decision was made to inquire into St. Patrick’s denial of privileges. Accordingly, a letter was sent by Renee Smith, Memorial Hospital’s medical staff coordinator, to Joseph Delafield, Dr. Fontenot’s counsel in her suit against St. Patrick, requesting information on this issue. By letter dated March 7, 1989, Elton Williams, Memorial Hospital’s president, informed Dr. Fontenot that her application was incomplete and | ¡¡.that she was responsible for providing information pertaining to St. Patrick’s termination of her privileges. At the March 17, 1989, April 21, 1989, and May 19, 1989, meetings of the Department of Surgery, its minutes indicate that it was still awaiting further information from Dr. Fontenot pertaining to St. Patrick’s denial of privileges and that she had been notified of her responsibility for providing the information.
Dr. Fontenot met with Williams in early or mid-1990 concerning her application. He questioned her about the denial of privileges by St. Patrick and requested more information regarding her law suit against St. Patrick. Dr. Fontenot also met with Smith and informed her that she did not have any further information concerning the denial of privileges. However, she gave Smith permission to contact her attorney regarding the law suit.
On November 7, 1990, counsel for Dr. Fontenot wrote Williams inquiring into the status of her application. The letter also included four character references from doctors who were on the medical staff of Memorial Hospital. Williams responded to this letter on November 9, 1990, reiterating that Dr. Fontenot’s application was still incomplete and would not be acted upon until Memorial Hospital received further information concerning the denial of privileges at St. Patrick and her subsequent law suit against the hospital. Dr. Fontenot’s counsel then requested Memorial Hospital to specify as to the information it was seeking from Dr. Fontenot. Williams never responded to this letter.
On April 10, 1991, Dr. Fontenot filed suit against Memorial Hospital and Williams (referred to collectively as Memorial Hospital) alleging that they | ¡¡discriminated against her because she was a podiatrist by refusing to consider and process her application in violation of La.R.S. 37:1301(B) and (D) and Memorial Hospital’s own bylaws. She further alleged that the discriminatory and arbitrary actions of Memorial Hospital were an unfair trade practice in violation of La.R.S. 51:1405, et seq. In addition to compensatory damages and attorney’s fees, Dr. Fontenot requested injunctive relief via an order requiring Memorial Hospital to appoint her to its staff.
Memorial Hospital filed a dilatory exception of prematurity, which was dismissed by the trial court. After answering Dr. Fontenot’s petition, it filed peremptory exceptions of prescription and no right of’ action. The trial court referred the exception of prescription to the trial on the merits, but dismissed the exception of no right of action.
*1114 Following a hearing on December 1-2, 1993, Judge Charley Quinalty, issued a preliminary order granting Memorial Hospital’s exception of preemption as to Dr. Fontenot’s unfair trade practice claims and dismissing her claim of discrimination pursuant to La.R.S. 37:1301. The trial court ordered Dr. Fontenot to furnish information pertaining to insurance coverage, personal health status, current licensing for the practice of podiatry, and specify in writing the specific privileges she was seeking to Memorial Hospital within six months of the preliminary order being rendered. The trial court next ordered Memorial Hospital’s chief executive officer to transmit Dr. Fontenot’s application and supporting data, a complete copy of the materials from St. Patrick, and a complete copy of the trial court’s opinion to Memorial Hospital’s Credentials Committee for immediate processing. Finally, the |4trial court ordered Memorial Hospital to process Dr. Fontenot’s application in accordance with its “ ‘Policy on Appointment’ ARTICLE II — Part D, excepting ARTICLE II — Part D Section 5(b) permitting a deferral, absent further Court orders.”
Pursuant to the preliminary order, Dr. Fontenot submitted the ordered information to Memorial Hospital. On May 4, 1994, Dr. David Dobbins, the chairman of Memorial Hospital’s Credentials Committee, wrote Dr. Fontenot requesting the submission of further information pertaining to her qualifications. The information consisted of bona fide continued medical education certificates, operative reports of complicated cases, complication rate for surgical procedures, and specific cases relating to diabetes, peripheral vascular disease, and human immunodeficiency.
A week later, Dr. Dobbins wrote Dr. Fontenot requesting that she provide the Credential Committee with “a copy of her original patient log to reflect all patients seen by you during the month of November, 1993, together with a diagnosis for each patient and whether any surgical procedure was carried out by you on that patient.” Dr. Dobbins indicated that the Credentials Committee further intended to request “certain complete patient charts on a representative sampling of patients from this list once our review of this initial information has been completed.”
Following the receipt of these two letters, Dr. Fontenot requested a hearing before the trial court to discuss the extent of the information requested by Memorial Hospital. After hearing argument in chambers, the trial court held that Memorial Hospital’s bylaws did not authorize the request of information from Dr. Fontenot. Memorial Hospital’s motion to reconsider this decision was denied.
|sOn July 6, 1994, Memorial Hospital’s Department of Surgery (Surgery) forwarded its report to Dr. Dobbins regarding Dr. Fontenot’s application for privileges. Dr. Travis Spears, chairman of the department, stated that Surgery found Dr. Fon-tenot’s application unique because her privileges had been revoked by another hospital and because she had been operating without the benefit of peer review for the past several years. Dr. Spears stated that this made it difficult for Surgery to determine her present level of competence. Since the trial court had denied the request for further information, Surgery determined that Dr. Fontenot was not qualified for surgical privileges in 1988, and that it did not have sufficient information to determine her present level of competence. Thus, Surgery made no recommendation as to her application. This recommendation was adopted by the Credentials Committee on July 7,1994.
On September 6, 1994, Memorial Hospital filed a Motion for Further Reconsideration of Court’s Ruling excluding the requested evidence, based on the fact that Dr. Fontenot intended to introduce forty surgical reports at a hearing requested by her pursuant to Memorial Hospital’s bylaws. Following a hearing on the motion, the trial court ordered Dr. Fontenot to submit the surgical reports to Memorial Hospital, along with the records of three *1115 patients who were alleging claims of medical malpractice against her. The trial court further granted Memorial Hospital thirty days to review the records in order to determine whether it still wished to deny her privileges.
On October 11, 1994, Surgery met and again considered Dr. Fontenot’s application, along with the operative notes on ten patients and the office records of |sthe three patients alleging medical malpractice. After reviewing these records, it denied Dr. Fontenot’s application based on the fact that it was unable to determine her present competence and qualifications for privileges based on the information submitted. The Credentials Committee agreed with this determination; thus, it felt that it could not give a positive recommendation to the Board of Directors. Notice of this determination was sent to Dr. Fontenot on October 24,1994.
Following this denial, Dr. Fontenot requested an administrative hearing pursuant to Memorial Hospital’s bylaws. This hearing was held on December 19, 1994, before a three member panel composed of two physicians and one lay-person, and presided over by a retired judge of the Fourteenth Judicial District. After hearing testimony and receiving evidence, the hearing panel issued a report on July 21, 1995, which upheld the Credentials Committee’s decision not to recommend Dr. Fontenot for staff privileges. The hearing panel found that she failed to present evidence sufficient to prove her current competence to perform the surgical procedures for which she requested privileges. Dr. Fontenot appealed this decision to the Board of Directors of Memorial Hospital, but that appeal was denied.
On September 22, 1995, Dr. Fontenot filed a Second Supplemental and Amending Petition, reiterating her claim of discrimination pursuant to La.R.S. 37:1801(B), (D), and Memorial Hospital’s bylaws, her claim of unfair trade practice pursuant to La.R.S. 51:1405, et seq., and alleging that Memorial Hospital’s actions arbitrarily and capriciously infringed upon her substantive due process rights pursuant to the Fourteenth Amendment of the U.S. Constitution and the La. Const, of 1974, Article I, § 2. She further reiterated that she was seeking injunctive and/or 17mandamus relief ordering Memorial Hospital to grant her staff and surgical privileges.
In response to a dilatory exception of vagueness filed by Memorial Hospital, Dr. Fontenot filed a Third Supplemental and Amending Petition on November 14, 1995, explicitly setting forth the basis of her claim against Williams. On September 22, 1997, Judge Alcide Gray[1] rendered an opinion holding that Dr. Fontenot would only be entitled to monetary damages with regards to Memorial Hospital’s application process if she successfully proved the claims in her amended petition. On September 8, 1998, Dr. Fontenot filed her Fourth Supplemental and Amending Petition alleging that Memorial Hospital sexually discriminated against her by refusing to grant her staff and surgical privileges, while granting privileges to three male podiatrists.
On September 8, 1998, the trial court granted a motion by Dr. Fontenot to strike the jury. The case proceeded to trial the next day. After taking the matter under advisement, the trial court issued written reasons finding that Memorial Hospital sexually discriminated against Dr. Fonte-not by refusing to properly process her application. On September 9, 1999, the trial court rendered judgment awarding Dr. Fontenot $75,000 in damages and $100,000 in attorney’s fees. The trial court further held that Dr. Fontenot was entitled to injunctive relief and ordered Memorial Hospital to grant her staff and surgical *1116 privileges with the proviso that she not perform any rear-foot and ankle surgeries until she obtained recertification in those 1 .procedures. Finally, the trial court dismissed all claims against Williams with prejudice. Both Dr. Fontenot and Memorial Hospital appeal this judgment.
ISSUES
Dr. Fontenot raises five assignments of error on appeal:
1) The trial court erred by only awarding her $75,000 in damages.
2) The trial court erred by failing to consider and not finding Memorial Hospital liable for breach of its own bylaws.
3) The trial court erred in failing to consider and not finding Memorial Hospital liable for not according her substantive due process.
4) The trial court erred in failing to consider and not finding Memorial Hospital liable under the Louisiana Unfair Trade Practices Act.
5) The trial court erred in failing to consider and not finding Memorial Hospital liable for negligence under La.Civ.Code art. 2315 and La.R.S. 37:1801(B).
Memorial Hospital also raises five assignments of error on appeal:
1) The trial court committed a reversible error of law by granting relief for claims which had prescribed.
2) The trial court committed a reversible error of law by finding that it sexually discriminated against Dr. Fontenot.
3) The trial court committed a reversible error of law by determining that it was subject to and had violated the due process clause of the Fourteenth Amendment.
4) The trial court committed a reversible error of law and fact by ordering it to process Dr. Fontenot’s incomplete application and to admit her to its medical staff.
5)The trial court committed a reversible error of law and fact by awarding general damages to Dr. Fontenot.
| .PRESCRIPTION
Memorial Hospital argues that the trial court erred in denying its peremptory exception of prescription as to Dr. Fonte-not’s claims of a delictual or quasi-delictual nature. Since this issue could render the other issues moot, we shall address it first.
Dr. Fontenot first learned that Memorial Hospital considered her application incomplete by letter dated March 7, 1989. She met with Williams and Smith sometime in early to mid-1990, and informed them that she had no further information concerning St. Patrick’s denial of her privileges. On November 7, 1990, her counsel again inquired as to the status of her application and was told that it was considered incomplete awaiting the receipt of further information pertaining to St. Patrick’s denial. Dr. Fontenot filed suit against Memorial Hospital on April 10, 1991.
The trial court held that the prescriptive period had not commenced to run on her claims because the harm occasioned her by Memorial Hospital’s refusal to process her application was of a continuing nature. Thus, the trial court held that Dr. Fonte-not’s claims had not prescribed even though she filed her lawsuit against Memorial Hospital more than two years after she was notified that her application was considered incomplete.
After reviewing the evidence, we find no merit in this assignment of error. We agree with the trial court’s finding that the harm caused by Memorial Hospital’s failure to process Dr. Fontenot’s application was of a continuing nature; thus, the prescriptive period had not commenced running on her claims at the time she filed suit. South Central Bell Tel. Co. v. Texaco, Inc., 418 So.2d 531 (La.1982). I^This finding is buttressed by the fact that Dr. Fontenot could not avail herself *1117 of any administrative remedies while her application was held in limbo. Additionally, the parties stipulated at the first trial that Dr. Fontenot received only two official notifications from St. Patrick concerning its termination and denial of her privileges, neither of which gave a reason for the termination. Thus, we find that the trial court did not err in denying Memorial Hospital’s peremptory exception of prescription. This assignment of error is dismissed as being without merit.
STATE ACTION
Memorial Hospital next argues that the trial court erred by finding that its failure to process Dr. Fontenot’s application constituted state action; thus, subjecting it to the provisions of the Fourteenth Amendment and La. Const. art. I, § 2. It further argues that the trial court erred by finding' that it violated its own bylaws by failing to process her application; thus, violating her right to due process.
Both the Fourteenth Amendment and La. Const. art. I, § 2 act as a personal protection against the deprivation of life, liberty, or property without “due process of law.” In order to invoke the due process clause of either constitution, a plaintiff must first show that “some property or liberty interest has been adversely affected by state action.” Price v. U-Haul Co. of Louisiana, 98-1959, p. 3 (La.9/8/99); 745 So.2d 593, 594; Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). “However, a private entity can be held to constitutional standards when its actions so approximate state action that they may be fairly attributed to the state.” Lansing v. City of Memphis, 202 F.3d 821, 828 (6th Cir.2000); see also Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Since “[t]he federal and state due process Inguarantees are stated in virtually identical language,” we will utilize federal cases for guidance on the issue of whether Memorial Hospital’s actions constituted state action. Price, 745 So.2d at 594.
In Price, 745 So.2d at 594-95, the supreme court discussed the analysis used by federal courts for determining whether actions by a private entity should be considered state action:
Historically, the federal jurisprudence generally subdivided the determination of state action into two basic categories of analysis: (1) public function concept and (2) nexus concept. Under the public function concept, state action was present when a private party engaged in certain governmental functions which were “state-like” enough to implicate the constitutional guarantees. Under the nexus concept, the state action determination turned on the relationship between the state and the activities of the alleged private wrongdoer. A subcategory of the nexus test was the state encouragement theory, under which the private party was said to have been encouraged by the state. John E. Nowak, et al., Constitutional Law 502-513 (2d ed.1983). The nexus concept was a fluid one for which the courts declined to articulate a formal test, often stating that “[o]nly by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance.” Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).
Several factors have been identified by the Supreme Court as being insufficient unto themselves to justify the finding of a close nexus between a private entity and the state: (1) state regulation of an entity, even if extensive; (2) public funding or private use of public property; (3) state approval or acquiescence into the actions of the private entity; (4) the presence of a minor number of public officials on the board of a private entity; and (5) utilization of public services by private actors. Lansing, 202 F.3d 821.
|12The Memorial Hospital Service District of the Parish of Calcasieu, State of Louisiana (District), is a political subdivi *1118 sion of the State of Louisiana, created pursuant to Chapters 13 and 14-A of title 39 of the Louisiana Revised Statutes. The Southwest Louisiana Hospital Association d/b/a Lake Charles Memorial Hospital (SLHA) is a non-profit corporation. The Southwest Louisiana Health Care System, Inc. (SLHCS), also a non-profit corporation, is the sole member of the SLHA. In 1992, the District resolved to issue tax exempt revenue bonds, not to exceed $60,000,000, in order to loan the funds to SLHCS to be used for specified purposes, including the refunding of two prior bond issuances. An answer in response to an interrogatory indicated that the District received $44,501,408 in proceeds from the issuance of tax exempt revenue bonds in 1992. In addition to the District’s loan of proceeds from the bond issuances to Memorial Hospital, Williams further testified that it also received Medicare and Medicaid benefits as payments for patients’ bills.
Following the first hearing, Judge Qui-nary held that Memorial Hospital’s failure to process Dr. Fontenot’s application constituted state action since it received state funds. In his Preliminary Order, Judge Quinalty wrote:
At common law, private hospitals, as opposed to public hospitals, possess broad discretionary powers in conferring staff privileges. Silver v. Castle Memorial Hospital, [53 Haw. 475,] 497 P.2d 564 (Ha.1972). This is being eroded whenever private hospitals derive benefits in the form of public funding, but should be of no moment if one accepts a proposition that any hospital occupies a fiduciary trust relationship between itself, its staff, and the public it seeks to serve. Ascherman v. Saint Francis Memorial Hospital, [45 Cal.App.3d 507,] 119 Cal.Rptr. 507 at 509 and cases cited therein (1st Cal.App.Dist.1975). This is so because the rationale for any distinction between a public, quasi-public, and truly private hospital breakdown, especially if the patients are considered to be of primary concern. It is not seriously disputed that Defendant, though nonprofit, was, is, and will continue to be the recipient of public funds sufficient |13to constitute state actions subjecting it to the provisions of the Fourteenth Amendment. Shaw v. Hospital Authority of Cobb County, 507 F.2d 625 (5[th] Cir.1975).
We disagree with this finding. The United State Supreme Court has held that the receipt of federal funding is insufficient to convert the actions of a private entity into state action for the purposes of the Fourteenth Amendment. Blum, 457 U.S. 991, 102 S.Ct. 2777; Rendell-Baker, 457 U.S. 830, 102 S.Ct. 2764; see also Crowder v. Conlan, 740 F.2d 447 (6th Cir.1984); Lansing, 202 F.3d 821. Thus, we find that Memorial Hospital’s receipt of public funding does not change this action into state action. Neither Dr. Fontenot nor the trial court articulated any other reasons why Memorial Hospital should be held to be a public actor and, thus, subject it to the due process clause of the Fourteenth Amendment and La. Const. Art. I § 2. Therefore, if Memorial Hospital’s actions were not state actions, it acted in the capacity of a private entity who is not subject to the due process guarantees of the Fourteenth Amendment and La. Const. art. I, § 2.
DUE PROCESS
Memorial Hospital further argues that the trial court erred in ordering it to process Dr. Fontenot’s incomplete application. Despite a finding of no state action, we find that the legislature intended to provide minimum due process to Dr. Fon-tenot as evidenced by the promulgation of La.R.S. 40:2115 and La.R.S. 37:1301. La. R.S. 40:2115 provides in pertinent part:
A. Each hospital shall have a single, organized medical and dental staff.
[[Image here]]
C. No individual shall be automatically entitled to membership on |uthe medical and dental staff or to the exercise of any clinical privilege solely on the basis of his license to practice in any state, his *1119 membership in any professional organization, his certification by any clinical examining board, or his clinical privileges or staff membership at another hospital without meeting the reasonable criteria for membership established by the governing body of the respective hospital.
D. The provisions of this Section shall in no way affect the provisions of R.S. 37:1301.
E. A hospital shall establish rules, regulations, and procedures setting forth the nature, extent, and type of staff membership and clinical privileges, as well as the limitations placed by the hospital on said staff membership and clinical privileges for all health care providers practicing therein.
A hospital is defined as “any institution, place, budding, or agency, public or private, whether for profit or not.” La.R.S. 40:2101(A). La.R.S. 37:1301 provides in pertinent part:
B. It shall be unlawful for the governing body of a nonprofit hospital which receives local, state, or federal funds to discriminate in granting staff membership to physicians or podiatric physicians. ... Nothing in this Section shall be construed to require the governing body of any nonprofit hospital to grant staff membership to any applicant provided that each such applicant is considered on an individual basis regarding his qualifications, and further provided that the applicant is not discriminated against on the sole basis of being a podiatric physician.
[[Image here]]
D. Nothing in this section shall be construed as prohibiting the governing body of any nonprofit hospital from granting or denying staff membership on basis of individual character, competence, experience and judgment of the physician or podiatric physician seeking staff membership or from requiring the character recommendation of not more than three members of the staff for which membership is sought as a prerequisite to consideration for staff membership.
The legislature, by requiring hospitals to establish rules, regulations, and procedures, surely intended that applicants for staff privileges wquld be entitled to at least minimum due process. “An elementary and fundamental requirement of due | ^process is notice reasonably calculated under all the circumstances to appraise interested parties of the pendency of the action and to afford them an opportunity to present their objections.” Fields v. State, Through the Dep’t of Public Safety and Corrections, 98-0611, p. 20 (La.7/8/98); 714 So.2d 1244, 1258.
The bylaws in effect at the time Fonte-not first applied for staff privileges with Memorial Hospital were the Bylaws of the Medical Staff of Lake Charles Memorial Hospital. Pursuant to Article III, Section 3, the governing body of Memorial Hospital makes appointments to the staff within 120 days of receiving a recommendation from the medical staff. After 120 days, it may resort to other sources in order to make a recommendation. Article IV, Section 1 provides the procedures for appointment and reappointment. The application must be in writing and include information pertaining to the applicant’s professional qualifications, including whether membership status and/or clinical privileges have ever been revoked, suspended, or reduced. The applicant has the burden of producing adequate information for evaluation of her competence, character, ethics, and other qualifications, and is responsible for resolving any doubts about her qualifications. As part of the application, the applicant authorizes Memorial Hospital to consult with members of medical staffs of other hospitals and others who may have information pertaining to her competence, character, and ethical qualifications. The Chief Executive Officer receives the application and transmits it to the Credentials Committee.
*1120 Section 2 of Article II provides the Appointment Process. The Credentials Committee presents a written report of its investigation and its [^recommendation to appoint, reject, or defer to the Executive Committee within sixty days of receiving the application. The bylaws require every department the applicant is seeking privileges in to provide the Credentials Committee with specific written recommendations for delineating the applicant’s clinical privileges. If possible at the next regularly scheduled meeting, the medical staff, after receiving the Credentials Committee and Executive Committee’s recommendation, recommends either acceptance, rejection, or deferral to the governing body. If the decision is to defer, the medical staff decides within twenty days whether to accept or reject the application. If the decision is to reject, the Chief Executive Officer must promptly notify the applicant by certified mail of the decision. The governing body need not be notified of the decision until after the applicant has exercised or waived her right to a hearing as provided by Article VIII, which provides for a right to hearing and appellate review upon an adverse decision and sets out procedural safeguards.
On April 27, 1989, Memorial Hospital adopted the Policy on Appointment, Reappointment and Clinical Privileges of Lake Charles Memorial Hospital, which superseded and replaced the prior Bylaws. As pointed out by Judge Quinalty, the procedures were spelled out in greater detail. However, there are some changes. Article II — Part C, Section 3 Burden of Providing Information provides that the applicant shall have the burden of:
[Pjroducing adequate information for a proper evaluation of his/her competence, character, ethics and other qualifications, and of resolving any doubts about such qualifications.... Until the applicant has provided all information requested by the hospital, the application for appointment or reappointment will be deemed incomplete and will not be processed.
The application still contains an authorization providing Memorial Hospital with the _J^authority to consult with anyone or obtain information pertaining to the applicants professional qualifications, including competence.
“Part D: Procedure for Initial Appointment, Section 1, Submission of Application” provides that Chief Executive Officer receives the application and then determines whether it is complete before transmitting it to the Credentials Committee. After receiving a written report from the chairperson of each department in which the applicant seeks privileges, the Credentials! Committee shall make a written report and recommendation to the Board of Trustees within ninety days of receiving the application. If the delay is longer than ninety days, notice of the reason for delay shall be sent to the applicant. If the Credentials Committee recommends to defer the application, a decision must be made within thirty days whether to appoint or reject the application.
Dr. Fontenot submitted her application to Memorial Hospital on December 14, 1988, after which it notified her that further information was required concerning St. Patrick’s denial of privileges. Memorial Hospital also wrote St. Patrick requesting information pertaining to the denial. J. William Hankins responded on February 8, 1989, informing Williams that Dr. Fontenot held temporary privileges from August 8, 1986 until September 27, 1988, and that her application for privileges were denied on December 15, 1988. Han-kins also invited Williams to call him if he had any questions or wished to discuss the matter further.
Smith testified that Dr. Fontenot’s application was sent to Surgery to be reviewed for completeness. She stated that she and Williams, with the approval of Surgery, decided that Dr. Fontenot’s application was incomplete. Thus, the appli *1121 cation was never presented to the Credentials Committee.
|TSPr. Fontenot testified that she met with both Williams and Smith and informed them that she did not have any further information pertaining to St. Patrick’s actions and gave them permission to contact her attorney. This was in addition to the authorization contained in the application itself. Moreover, the parties stipulated at trial that the only two official notifications received by Dr. Fontenot from St. Patrick did not contain any reasons for its denial of her privileges.
Dr. Ken Moss, the chairman of the Credentials Committee in 1989, testified that an application is only considered by the Credentials Committee if it is complete. He stated that he and Smith decided that Dr. Fontenot’s application was incomplete; thus, it was not reviewed by the committee. If an application was felt to be incomplete, Dr. Moss stated that it was the applicant’s responsibility to gather or request information to render the application complete.
Dr. Reed Fontenot, the chairman of Surgery in 1989, stated that her application was not considered by that department because it was incomplete. He stated that the department felt that it needed further information concerning St. Patrick’s denial of privileges, and that it was the applicant’s responsibility to obtain the required information.
Under the facts presented here, we find that Memorial Hospital failed to afford Dr. Fontenot with at least minimal due process in the handling of her application. Despite the stipulation and her testimony that she had no further information pertaining to St. Patrick’s denial, Memorial Hospital refused to proceed with her application. While Dr. Fontenot did not have access to this information, Memorial Hospital could have received this information via the authorization signed by Dr. Fontenot, and, in fact, was invited to call Hankins to discuss the matter further. |13As a result of its tabling of her application, Dr. Fontenot was denied due process. As long as her application was deemed incomplete, she had no recourse to any type of hearing or remedies. Pursuant to the Bylaws and the Procedures on Appointment, Dr. Fontenot could not question or appeal the finding that her application was incomplete until the Credentials Committee fully considered and decided to accept, reject, or defer it. Accordingly, we find that Memorial Hospital failed to accord Dr. Fontenot at least minimal due process in the processing of her application. The judgment of the trial court ordering Memorial Hospital to process her application is affirmed, and this assignment of error is dismissed as being without merit.
MEMORIAL HOSPITAL’S ACTIONS
In these assignments of error, Dr. Fon-tenot argues that the trial court erred in failing to find Memorial Hospital liable for breaching its own bylaws and in failing to accord her substantive due process. She further argues that the trial court erred in failing to find Memorial Hospital liable under the Louisiana Unfair Trade Practices Act and negligent pursuant to La.Civ. Code art. 2315 and La.R.S. 37:1301. Memorial Hospital argues that the trial court erred in finding it liable for sexually discriminating against Dr. Fontenot.
In his opinion, Judge Gray held that whether Memorial Hospital violated its bylaws by failing to consider Dr. Fontenot’s application was rendered irrelevant by the passage of La.R.S. 37:1301. He held that the statute was “controlling, and has downsized the issue in this case to a factual inquiry into whether or not plaintiffs application was truly considered regarding her qualifications, or whether defendant intended to and did discriminate against plaintiff by refusing to properly process and consider her application.” While we agree with this finding in part, we do not believe [ 2nthat La.R.S. 37:1301 has foreclosed a possible claim under the Unfair Trade Practices Act. We will first discuss Dr. *1122 Fontenot’s claims arising under La.R.S. 37:1301.
La.R.S. 37:1301
As stated previously, La.R.S. 37:1301(B) makes it unlawful for a nonprofit hospital to discriminate against a physician or podiatrist when granting staff privileges. The statute further requires a nonprofit hospital to consider the qualifications of each applicant for staff privileges individually, but does not prohibit it from granting or denying such privileges on the “basis of individual character, competence, experience and judgment.” La.R.S. 37:1301(B) and (D).
Article III, Section 2(A) of the Bylaws in effect when Dr. Fontenot applied for privileges contains the qualifications for membership:
Only physicians and dentists licensed to practice in the State of Louisiana, who can document their background, experience and training, and who have demonstrated competence, their adherence to the ethics of their profession, their good reputation, with sufficient adequacy to assure the medical staff and the governing body that any patient treated by them in the Hospital will be given a high quality of medical care, shall be considered for membership on the medical staff. No physician or dentist shall be entitled to membership on the medical staff or to the exercise of particular clinical privileges in the Hospital merely by virtue of the fact that he is duly licensed to practice medicine or dentistry in this or in any other state, or that he is a member of any professional organization, or that he had in the past, or presently has, such privileges at another hospital.
In the “Policy on Appointment,” adopted by Memorial Hospital in 1989, Article II— Part A, Section 2 provides the specific qualifications for appointment to the medical staff:
Only physicians, podiatrists and dentists who:
(a) are currently licensed to practice in this state;
(b) are located within the geographic service area of the hospital as defined by the Board, close enough to provide 121 timely care for their patients;
(c) are fully qualified as a health care provided under. Title XIII, Patients’ Compensation Fund, (R.S. 40:1299 et seq.) and provide evidence of such fact in a form acceptable to the hospital;
(d) can document their:
(1) background, experience, training and demonstrated competence,
(2) adherence to the ethics of then-profession,
(3) good reputation and character, including the applicant’s mental and emotional stability, and
(4) ability to work harmoniously with others sufficiently to convince the hospital that all patients treated by them in the hospital will receive quality care and that the hospital and its medical staff will be able to operate in an orderly manner, shall be qualified for appointment to the medical staff.
Section 3 of Part A further provides that no one is entitled to appointment to the medical staff merely because he is licensed to practice in Louisiana or any state, is a member of a particular professional organization, or has been or is currently on the medical staff of any hospital. Section 4 states that “[n]o individual shall be denied appointment on the basis of sex, race, creed, color or national origin.”
In the oft quoted Sosa v. Board of Managers of the Val Verde Memorial Hospital, 437 F.2d 173, 177 (5th Cir.1971), the court stated,
In the instant case there was considerable evidence regarding Dr. Sosa’s ethical and professional competency. No court should substitute its evaluation of such matters for that of the Hospital Board. It is the Board, not the court, which is charged with the responsibility *1123 of providing a competent staff of doctors. The Board has chosen to rely on the advice of its Medical Staff, and the court cannot surrogate for the Staff in executing this responsibility. Human lives are at stake, and the governing board must be given discretion in its selection so that it can have confidence in the competence and moral commitment of its staff. The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance. The court is charged with the narrow responsibility of assuring that the qualifications imposed by the Board are reasonably ^related to the operation of the hospital and fairly administered. In short, so long as staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court should not interfere. Courts must not attempt to take on the escutcheon of Caduceus.
Thus, we are limited to a determination of whether Memorial Hospital considered Dr. Fontenot’s qualifications individually and fairly.
After Dr. Fontenot resubmitted her application pursuant to Judge Quinalty’s order, the Credentials Committee requested further information from Dr. Fontenot pertaining to continued medical education certificates, operative reports of complicated cases, complication rate for surgical procedures, and specific cases related to diabetes, peripheral vascular disease, and HIV. On May 11, 1994, the Credentials Committee requested Dr. Fontenot’s patient charts for November 1993. However, Judge Quinalty ruled that she did not have to produce this information. Denied this information, the Credentials Committee then determined, based on Surgery’s recommendation, that it lacked sufficient information to qualify Dr. Fontenot for surgical privileges.
After Dr. Fontenot submitted the forty operative reports and records of the three patients alleging malpractice, Surgery reviewed ten of the operative reports and determined that it still lacked sufficient information to qualify Dr. Fontenot for privileges. Dr. David Dobbins, the chairman of the Credentials Committee in 1994, testified that the Credentials Committee reached the same conclusion based on this recommendation.
Three male podiatrists were admitted to Memorial Hospital’s staff after Dr. Fonte-not’s application was denied. Dr. Dobbins testified that Dr. Robert Arango was asked to submit one to two months of patient charts; but he did not know if Dr. | ^Arango was asked to provide information pertaining to complicated cases. With regard to Dr. Albert Kopp, Dr. Dobbins only remembered that he was recommended for staff privileges by physicians who knew and worked with him. Dr. Dobbins could not recall if Dr. Kopp was asked to submit any patient charts.
Dr. Dobbins’ testimony before the administrative hearing panel tracked his testimony at that trial on the merits. However, he expounded on the credentialing process, stating that it ensures applicants are sufficiently trained by determining if their peers would vouch for them. Dr. Dobbins further stated that Dr. Arango’s records were complete from the initial patient visit, through decisions on what treatment to try, alternatives, surgery, and thereafter.
Surgery felt that further information was required before a determination could be reached on whether Dr. Fontenot’s application for privileges should be granted. On June 27, 1994, a motion was made and seconded by Surgery finding that Dr. Fon-tenot was not qualified for surgical privileges in 1988, and that it could not reach a decision as to her current competence due to a lack of information. Thus, no decision was made to accept or reject her application at that time.
*1124 Dr. Travis Spears, the head of Surgery-in 1994, admitted that he could not recall whether it reviewed Dr. Fontenot’s 1988 application or the favorable responses from various doctors to the 1988 questionnaires sent out by Dr. Moss. Dr. Spears testified that Surgery requested Dr. Fon-tenot’s November 1998 patient charts so it could review a randomly selected group of patients and determine her method and quality of care. He likened this review to that of a peer review.
On October 11, 1994, Surgery met to review ten of the forty operative reports submitted by Dr. Fontenot, after which it reported to the Credentials | ^Committee that the records were inadequate and prevented it from evaluating her overall standard of care.
Dr. Spears testified that Surgery felt it needed to review Dr. Fontenot’s complete patient records in order to gain insight into her surgical judgment. An entire patient chart would document information from presentation through follow-up care and would enable Surgery to determine whether there was an actual indication for surgery or whether less invasive treatment modalities were indicated and exhausted. Dr. Spears stated that the surgical reports submitted by Dr. Fontenot did not include this thought process. He further stated that he could not recall any other applicant during his tenure being required to submit this type of information. However, he stated that Dr. Fontenot’s situation was unique since she had not been subject to peer review for many years.
Dr. Arango testified that he practiced as Dr. Fontenot’s associate for eighteen months before being granted privileges at Memorial Hospital. When he applied for privileges, he stated that he submitted his application, licenses, and diplomas. Dr. Arango testified that Memorial Hospital initially found his application incomplete and requested that he submit his surgical logs, as well as letters of recommendation. He stated that his surgical log listed the types of surgeries he had performed and contained information pertaining to the initial diagnosis, determination as to the type of surgery to be performed, and the actual procedure of surgery. It did not include a patient history or physical or post-operative report.
Dr. Kopp testified that he began practicing in 1960 and was on the staff at the Surgery Center between 1977 and 1978, at Humana Hospital between 1984 and 1985, and was admitted to Memorial Hospital’s staff in 1994. In his application for | ¡¡.¿privileges at Memorial Hospital, Dr. Kopp stated that he submitted his college and professional school credentials, but was not required to submit patient charts. However, he stated that he only performs minor surgery.
Dr. Vernon Garber finished podiatry school in 1993, and began practicing in Louisiana in November 1994. He was admitted to Memorial Hospital’s staff in early 1995. Dr. Garber testified that he was required to submit his residency surgical logs as part of his application, which consisted of a listing of the surgical procedures, the dates and places they were performed, and information pertaining to whether he performed the procedures, assisted at them or was assisted, or merely observed the procedure.
Williams testified that Dr. Fontenot’s updated application was submitted to the Credentials Committee and Surgery, which determined that it did not contain sufficient evidence of her current competence. He stated that an October 24, 1994 letter informed her of this outcome and notified her of her right to appeal this decision. Pursuant to her appeal, a hearing was held before a three-person hearing panel. After hearing testimony and reviewing evidence, the hearing panel recommended that Dr. Fontenot’s application be denied because she failed to prove her current competence. Williams stated that Dr. Fontenot appealed this decision to the Board of Directors, but her appeal was *1125 denied. This exhausted her administrative remedies.
Williams stated that Memorial Hospital was responsible for maintaining information pertaining to its medical staffs current competence because it is required by its bylaws and because, as a teaching institution, it is required to obtain accreditation by a joint commission every three years. Williams stated that it was l¡>fialso important because of Memorial Hospital’s responsibility for the quality of care it renders to the community. At the hearing before the administrative hearing panel, Williams expoundéd on the issue of current competency. He stated that the Joint Commission on Accreditation of Health Care Organizations has four standards pertaining to medical staff credentials: (1) education and training, (2) quality, (3) health status, and (4) current competency. It also requires Memorial Hospital to maintain current written information by professionals pertaining to the professional abilities of the applicants.
Williams testified that there was a dichotomy between appointments and credentialing. The appointment process revolves around inquiring into an applicant’s background, training, character, and overall health, while credentialing requires a determination that an applicant is able and competent to perform the procedures for which credentials are sought. Williams further stated that Dr. Fontenot’s indication that her privileges had been terminated at another hospital threw up a red flag requiring further investigation. Finally, he testified that there is a relationship between demonstrated competence and current competence.
On the issue of discrimination, Williams stated that Memorial Hospital has a policy of nondiscrimination pursuant to Article 2(A)(4). He testified that 7.5 percent of the medical staff are female, and that no woman has been denied appointment to the medical staff since he has been with Memorial Hospital. Williams further stated that Memorial Hospital does not discriminate against podiatrists.
Dr. Arthur Primeaux, a family practitioner on staff at Memorial Hospital, participated on the hearing panel which heard Dr. Fontenot’s appeal from the Credentials Committee’s recommendation. He stated that the hearing panel relied on 127the deposition of Dr. Lee Tisa, a Chicago-based podiatrist, for its finding that Dr. Fontenot failed to prove her current competence to perform the surgical procedures for which she was requesting credentials. Dr. Primeaux stated that Dr. Tisa indicated that, if Dr. Fontenot had not been performing procedures, she would lose the ability to perform them; and if she had not performed the more complex surgeries within five years, she would need retraining in those procedures. Dr. Tisa further stated that Dr. Fontenot could regain her proficiency by repeating her residency. Dr. Primeaux testified that Dr. Fontenot also admitted that she needed refresher training in the more complex rear-foot and ankle procedures, but that she was competent to perform all other procedures.
Dr. Lawrence Futrell, an internist, also served on the hearing panel. He testified that, although Dr. Tisa’s deposition had a substantive impact on the panel’s decision, Dr. Fontenot was evaluated based on her individual demonstrated competence.
After considering all of the evidence, we find that Memorial Hospital did not discriminate against Dr. Fontenot pursuant to La.R.S. 37:1301, by failing to consider her application individually and fairly. Both the Credentials Committee and Surgery determined that it lacked sufficient information to determine whether Dr. Fontenot was currently competent to perform the procedures for which she requested privileges. This lack of information led to their request for further information in the form of her November 1993 patient charts. Dr. Spears testified that this information was crucial because Dr. Fontenot had not been subject to peer review for several years and the informa *1126 tion would have enabled Surgery to gain insight into her | ^surgical judgment, in a fashion similar to peer review. We find this to be a reasonable request, in light of the importance of Memorial Hospital knowing whether Dr. Fontenot is currently capable of performing those procedures for which she is seeking privileges. Additionally, pursuant to the Policy on Appointment, Dr. Fontenot bore the burden of providing adequate information for a proper evaluation of her competence and of resolving any doubts about that qualification.
We further find that Dr. Fontenot was not treated unfairly when compared to the three male podiatrist, especially Dr. Kopp. Although he had not been subject to peer review for nine years, Memorial Hospital did not require him to submit patient charts. However, neither Dr. Kopp, nor the other two male podiatrists, had ever had privileges terminated by a hospital. Additionally, Dr. Kopp was recommended by physicians who had worked with him. Although Dr. Fontenot was also recommended by other physicians, we cannot say that it was unreasonable for Memorial Hospital to request as much information as it possibly could in order to determine her current competence, considering her privileges had previously been terminated.
Nor do we find it unreasonable for Memorial Hospital to require information pertaining to current competence instead of demonstrated competence. We find that there is a correlation between demonstrated and current competence. It is reasonable for a hospital to require an applicant to demonstrate that he/she is currently able to perform the procedures for which they request privileges. Although an applicant may have been able to perform a procedure in the past, we think the pertinent question is whether they are currently competent to perform the procedure. Even Dr. Tisa testified that a physician could lose the ability to perform a procedure.
| aflThus, we find that Memorial Hospital should be given wide latitude in determining what information is necessary for it to reach a decision. As stated in Sosa, 437 F.2d at 177:
Human lives are at stake, and the governing board must be given discretion in its selection so that it can have confidence in the competence and moral commitment of its staff. The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance.
In this instance, Dr. Fontenot was denied privileges at another hospital and has not been subject to peer review since 1988. Although part of the blame for this may lie with Memorial Hospital, we do not find Dr. Fontenot free from blame. Had she provided the requested information in 1994, this matter could have been resolved then. Thus, we find that Memorial Hospital did not discriminate against Dr. Fontenot pursuant to La.R.S. 37:1301 by denying her application for privileges, and we render judgment accordingly.
Sexual Discrimination
On the issue of sexual discrimination, both Drs. Primeaux and Futrell testified that the hearing panel never discussed sexual discrimination in reaching its decision. Judge Woody Thompson, who presided over the administrative hearing, testified that there was no evidence of sexual discrimination against Dr. Fontenot. Dr. Fontenot testified that Williams told her that she would never be given privileges at Memorial Hospital because she was a podiatrist and a woman.
We find that the trial court erred in finding that Memorial Hospital sexually discriminated against Dr. Fontenot. La. R.S. 23:332 makes it unlawful for an employer to intentionally fail or refuse to hire an individual based on his/her sex. |3nThe only evidence tending to prove sexual discrimination in this instance was Dr. Fonte-not’s own self-serving testimony pertaining *1127 to what she was told by Williams and the fact that three male podiatrists were admitted to Memorial Hospital’s staff after her application was denied. However, we find this insufficient to prove sexual discrimination. Memorial Hospital’s failure to grant privileges to Dr. Fontenot was based on a legitimate issue, that of her current competency. Thus, we find no evidence of sexual discrimination. The judgment of the trial court finding that Memorial Hospital sexually discriminated against Dr. Fontenot is reversed. We further reverse the trial court’s judgment awarding her $75,000 in damages and $100,000 in attorney’s fees based on the sexual discrimination.
UNFAIR TRADE PRACTICE
In her final assignment of error, Dr. Fontenot argues that the trial court erred by failing to find Memorial Hospital liable under the Louisiana Unfair Trade Practices Act. However, since we find that Memorial Hospital acted reasonably in denying her application based on her failure to prove her current competence, we dox not find that its actions amounted to an unfair trade practice. Judgment is rendered in Memorial Hospital’s favor; and this assignment of error is dismissed as being without merit.
CONCLUSION
For the foregoing reasons, the judgment of the trial court finding that Southwest Louisiana Hospital Association d/b/a Lake Charles Memorial Hospital sexually discriminated against Dr. Rita Rae Fontenot is reversed, as is the judgment awarding damages and attorney’s fees. The trial court’s judgment denying Memorial | ai Hospital’s peremptory exception of prescription is affirmed, as is its finding that Memorial Hospital failed to accord due process to Dr. Fontenot. We order, adjudge, and decree that Memorial Hospital did not discriminate against Dr. Fontenot pursuant to La.R.S. 37:1301, nor is it liable to her pursuant to the Louisiana Unfair Trade Practices Act. We further vacate and set aside the injunction ordering Lake Charles Memorial Hospital to grant staff and surgical privileges to Dr. Fontenot. The costs of this matter, including the costs at the trial court level, are assessed to the plaintiff-appellant/appellee, Dr. Rita Rae Fontenot.
AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; AND RENDERED.

. Judge Gray was assigned this matter after Judge Quinalty recused himself due to a conflict of interest.